James **KLOTZ** and Mary **Klotz**, Appellants/Cross– Respondents,

v.

**ST. ANTHONY'S MEDICAL CENTER, Defendant,**

**Michael Shapiro, M.D., and Metro Heart Group, LLC, Respondents/Cross–Appellants.**

No. SC90107.

Supreme Court of Missouri, En Banc.

March 23, 2010.

As Modified May 25, 2010.

---

Louis M. Bograd, Andre M. Mura, Washington, DC, Mary E. Coffey, Genevieve J. Nichols, Coffey & Nichols, LLC, St. Louis, for appellants/cross-respondents.

J. Thaddeus Eckenrode, Lisa H. Howe, Eckenrode-Maupin, Clayton, for respondents/cross-appellants.

Kevin J. Davidson, David M. Zevan, St. Louis, for amicus curiae Paraquad, Inc.

Robert T. Adams, Shook, Hardy & Bacon, L.L.P., Kansas City, Mark A. Behrens, Christopher E. Appel, Shook, Hardy & Bacon, L.L.P., H. Sherman Joyce, Robin S. Conrad, Amar D. Sarwal, Allan J. Stein, Washington, D.C., Ann W. Spragens, Sean McMurrough, Des Plaines, IL, Gregg Dykstra, Indianapolis, IN, for amici curiae Mo. Chamber of Commerce and Industry, NFIB/Missouri, Mo. Motor Carriers Assn., Health Coalition on Liability and Accessibility, Chamber of Commerce of the United States of America, American Tort Reform Assn., Physicians Insurers Assn. of America, American Insurance Assn., Property Casualty Insurers Assn. of America, and Nat'l. Assn. of Mutual Insurance Companies.

Robyn Greifzu Fox, Catherine Vale Jochens, Moser & Marsalek, P.C., St. Louis, for amicus curiae The American College of Obstetricians and Gynecologists, et al.

Harvey M. Tettlebaum, Mark G. Arnold, Robert L. Hess, II, Husch Blackwell Sanders, LLP, Jefferson City, for amicus curiae Missouri State Medical Association and American Medical Association.

Tim Dollar, Kansas City, for amici curiae Missouri Coalition for Quality Care; National Association for the Advancement of Colored People.

Jay E. Sushelsky, Michael Schuster, Washington, D.C., for amicus curiae AARP.

John B. Boyd, Kansas City, Matthew J. Padberg, St. Louis, for amicus curiae Missouri AFL–CIO.

R. Kent Sellers, Jean Paul Bradshaw, II, Lathrop & Gage LLP, Kansas City, for amicus curiae Missouri Hospital Association.

Stephen G. Reuter, Lisa O. Stump, Lashley & Baer, P.C., Robert T. Haar, Susan E. Bindler, Haar & Woods, LLP, St. Louis, Ann K. Covington, Bryan Cave, LLP, Jefferson City, for amici curiae Washington University; St. Louis University; and University of Missouri.

William E. Quirk, Lauren E. Tucker McCubbin, Miriam E. Bailey, Polsinelli Shugart, P.C., Kansas City, for amicus curiae Missouri Professionals Mutual.

PER CURIAM.

### Nature of the Case

This is an appeal from a medical malpractice case that includes a spouse's claim for loss of consortium. The jury rendered verdicts in favor of James and Mary Klotz

and against St. Anthony's Medical Center (SAMC), Dr. Shapiro and Metro Heart Group (MHG). After the verdict, based on § 538.210, RSMo Supp.2008, the trial court reduced the noneconomic damages awarded to Mr. Klotz and eliminated the noneconomic damages awarded to Mrs. Klotz.

On appeal, the Klotzes claim application of § 538.210, RSMo Supp.2008, which reduced the cap on noneconomic damages for all suits filed after August 28, 2005, violates their rights under the Missouri Constitution. Specifically, they contend (1) application of the statute violates the prohibition of retrospective laws; (2) the statute violates the clear title and single subject clause; and (3) the statute violates multiple other constitutional provisions, including the rational basis requirement, the Equal Protection Clause, the prohibition against special legislation, the Due Process Clause, the right to open courts, the right to trial by jury and separation of powers.

Shapiro and MHG cross-appeal, alleging error in: (1) admitting evidence; (2) calculating damages; (3) limiting cross-examination; (4) allowing improper closing arguments; (5) instructing the jury; (6) denying a motion for a directed verdict; and (7) denying a motion for judgment notwithstanding the verdict.

The application of the new caps on noneconomic damages to causes of action that accrued before the effective date of the law violates the constitutional prohibition of retrospective laws. The judgment is reversed, and the case is remanded.

### Statement of Facts

James Klotz suffered sepsis, amputation, and organ failure in March 2004 when an implanted pacemaker became infected. He filed suit against SAMC for medical malpractice on December 14, 2004. On April 28, 2005, James Klotz amended his petition to include his wife, Mary Klotz, for loss of consortium. This action was voluntarily dismissed without prejudice on December 2, 2005. On December 4, 2006, James and Mary Klotz again filed suit against SAMC for medical malpractice and loss of consortium, and they amended their petition to add Dr. Shapiro and MHG as defendants on March 1, 2007. At the time of trial, the case was proceeding under the second amended petition filed March 13, 2008, which alleged that SAMC "failed to timely remove an IV catheter inserted into James Klotz' right hand by EMS on 3/17/04, allowing phlebitis and/or an infection to develop at the IV site," and failed to train its nursing staff. This second amended petition alleged that Dr. Shapiro and MHG "failed to adequately treat the phlebitis and/or infection in James Klotz' right hand before implanting a permanent pacemaker on 3/22/04, resulting in the spread of infection to the pacemaker," and "failed to inform plaintiff James Klotz of the heightened risk of infection caused by implanting the permanent pacemaker at the time of a presumed ongoing infection at the right wrist IV site."

The case was tried to a jury in July 2008. The jury found SAMC, MHG, and Dr. Shapiro negligent in their medical treatment of James Klotz, and the jury assessed 33% of the fault to SAMC and the remaining 67% of the fault to Dr. Shapiro and MHG. The jury awarded Mr. Klotz damages totaling $2,067,000, which included $760,000 in noneconomic damages. The jury also awarded Mary Klotz damages totaling $513,000, which included $329,000 in noneconomic damages for loss of consortium.

Following post-trial motions, the trial court concluded that the award against SAMC is governed by the prior version of § 538.210's noneconomic damages cap. The court concluded that the award against MHG and Dr. Shapiro is governed by the current version of § 538.210 as amended in 2005 by House Bill 393, which established a lower noneconomic damages cap of $350,000. Section 538.305 provides that this amended version of § 538.210

applies "to all causes of action filed after August 28, 2005." The trial court reduced James Klotz's award of noneconomic damages against MHG and Dr. Shapiro from $509,200 to $234,500. Likewise, based on amended § 538.210.4, the court reduced Mary Klotz's award of noneconomic damages against Dr. Shapiro and MHG from $220,430 to $0. The Klotzes timely challenged the constitutional validity of amended § 538.210 on several grounds, emphasizing in particular the constitutional prohibition against retrospective laws. *See* Mo. Const. art. I, sec. 13.

The trial court expressed its rationale for rejecting the argument that application of amended § 538.210 violated this constitutional prohibition against retrospective legislation. The trial court stated the legislature had cogent reasons to make the law retrospective; however, as to all of the other constitutional arguments, the court merely stated that those arguments "have been considered and DENIED."

While many special interest groups filed amicus curiae briefs relating to the constitutional validity of amended § 538.210, it is clear from reading the trial court's rulings that the trial court and the parties were keenly aware the resolution of this case likely turned on whether the prohibition against retrospective laws found at Mo. Const. art. I, sec. 13 applied to the facts of this case. The prior version of § 538.210, RSMo 2000, which included a noneconomic cap on damages in medical malpractice cases, set the cap at $350,000 and provided for an annual increase or decrease in accordance with the Implicit Price Deflator for Personal Consumption Expenditures published by the Bureau of Economic Analysis of the United States Department of Commerce. Further, it specifically provided the cap on noneconomic damages only applied to causes of action that arose

on or after the statute's effective date. For that reason, the original cap on noneconomic damages in medical malpractice cases, § 538.235, RSMo 2000, was never challenged on the basis that it was in violation of the Missouri constitutional prohibition against retrospective laws. *See Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. banc 1992).

## Analysis

This opinion will address the arguments necessary to resolve the dispute between the Klotzes, MHG and Dr. Shapiro.[1] More than a year after the cause of action for medical malpractice accrued in this case, the legislature reduced the cap on noneconomic damages to $350,000, and it provided that a husband and wife, as a marital unit, are only entitled to one cap of $350,000 in noneconomic damages, as opposed to two caps as authorized by the prior law.

■ Determination of a single issue resolves the Klotzes' appeal: whether the constitutional prohibition on retrospective laws allows the legislature to change the substantive law for noneconomic damages after a cause of action has accrued. The issue is straightforward. When the malpractice accrued, the legislature had an established cap on noneconomic damages, and both Mr. and Mrs. Klotz were entitled to their own noneconomic damages up to that cap amount. But § 538.210 reduced the cap on noneconomic damages for all suits filed after August 28, 2005, without regard to causes of action that had already accrued prior to August 28, 2005.

It is well established that the Missouri Constitution prohibits laws that are retrospective in operation. Mo. Const. art. I,

1. SAMC has satisfied its judgment and is no longer a party to this appeal.

sec. 13. ("That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, ... can be enacted.") The prohibition reflects "the underlying repugnance to the retrospective application of laws." *State ex rel. St. Louis–San Francisco Ry. Co. v. Buder,* 515 S.W.2d 409, 411 (Mo. banc 1974). This provision has been "part of Missouri law since this State adopted its first Constitution in 1820." *Doe v. Phillips,* 194 S.W.3d 833, 850 (Mo. banc 2006).

It is settled law in Missouri that the legislature cannot change the substantive law for a category of damages after a cause of action has accrued. In *Buder,* when the legislature passed a law that increased the defendants' exposure to more damages for wrongful death than existed at the time the cause of action accrued, this Court unanimously held the legislation was unconstitutional as applied under the constitutional prohibition of retrospective laws. 515 S.W.2d at 411. Similarly, when, as here, the legislature, contrary to this clearly established constitutional precedent, passes a statute that purports to decrease the amount of damages a victim of medical malpractice could recover after the cause of action has accrued, this Court is bound by *Buder* to find the statute unconstitutional as applied to the Klotzes. Therefore, the new noneconomic damages cap established by HB 393 may not be applied to a cause of action that accrued prior to August 28, 2005.

## Dr. Michael Shapiro's and Metro Heart Group's Cross–Appeals

### Point 1: Expert Testimony

Dr. Shapiro and MHG argue that the trial court erred in allowing Dr. Robert Clark to testify, contending Dr. Clark was not qualified to testify as an expert witness.

## Standard of Review

The trial court's decision whether to admit an expert's testimony will not be disturbed on appeal absent an abuse of discretion. *Swartz v. Gale Webb Transp. Co.,* 215 S.W.3d 127, 129–130 (Mo. banc 2007). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 130 (citing *McGuire v. Seltsam,* 138 S.W.3d 718, 720 (Mo. banc 2004)).

## Analysis

Dr. Shapiro and MHG offer three reasons to argue that the trial court erred in allowing Dr. Robert Clark to testify and offer expert opinions. First, they argue that Dr. Clark was not currently a licensed physician and, therefore, was not legally qualified to offer medical opinion testimony. Dr. Shapiro and MHG contend that the definition of "legally qualified" in § 538.225, RSMo Supp.2008, requires that the health care provider be licensed in the same profession to offer an affidavit certifying the merit of a case.

Dr. Shapiro and MHG further contend that because Dr. Clark was incapable of providing the required affidavit of merit under § 538.225, he should not have been permitted to testify at trial. Section 538.225 does not govern the admissibility of expert testimony at trial; rather, it requires that a plaintiff or a plaintiff's attorney file a health care affidavit from an expert stating that the defendant health care provider did not act as a reasonably prudent health care provider would have acted under similar circumstances. Satisfaction of § 538.225 is a condition related

to the filing of a malpractice action against a health care provider but does not control the admissibility of expert testimony.[2]

Section 490.065, RSMo 2000, specifically governs the admissibility of expert witness testimony, and it states that a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." An expert may be qualified to testify on foundations other than licensure. *Johnson v. State*, 58 S.W.3d 496, 499 (Mo. banc 2001). To apply § 538.225's definition of "legally qualified health care provider" to the question of the admissibility of expert testimony at trial would be to effectively rewrite the statute.

Second, Dr. Shapiro and MHG argue that the trial court erred when it allowed Dr. Clark to testify about issues related to the cardiology or electrophysiology standard of care because Dr. Clark lacked the qualifications to testify about that specialty. The trial court did not err in allowing Dr. Clark to testify. Section 490.065 is the standard for admitting expert testimony in civil cases. *McGuire v. Seltsam*, 138 S.W.3d at 720. As noted, pursuant to § 490.065, a witness is qualified as an expert by "knowledge, skill, experience, training, or education." Dr. Clark completed an internal medicine residency and did specialty training in infectious disease and pulmonary disease. Dr. Clark treated Mr. Klotz when he was admitted to the hospital in Phoenix. The Klotzes' attorney asked Dr. Clark numerous questions about whether the permanent pacemaker needed to be implanted immediately or whether Dr. Shapiro should have waited to implant the pacemaker until after determining whether Mr. Klotz had an infection. The testimony elicited related to the potential

for infection when a pacemaker is implanted and the specific infection in this case. Dr. Clark testified about the standard of care when a temporary pacemaker is implanted and there is an infection or risk of infection. As an infectious disease specialist, this was well within his expertise.

Finally, Dr. Shapiro and MHG argue that MAI 11.06, which defines "standard of care" as the ordinary care of a defendant's "profession," requires that expert testimony at trial be limited to persons in the defendant's specialty. No such requirement is recognized by this Court. As noted above, § 490.065 is the specific statute that determines the scope and admissibility of expert testimony in civil cases, and Dr. Clark was a qualified expert under this statute to provide the opinions about which he testified.

## Points II and III: Evidence of Future Damages and Their Reduction to Present Value

■ Dr. Shapiro and MHG argue that the trial court erred in allowing testimony about projected future damages and future medical expenses because such evidence was speculative, highly prejudicial, and not reduced to present value.

Dr. Belz, an expert witness for the Klotzes with a specialty in preventive medicine and certification as a life care planner, testified about the future costs that were reasonable and necessary as a result of Mr. Klotz's infection and sepsis. Counsel for Dr. Shapiro and MHG objected to Dr. Belz's testimony about projected future damages on the basis that projected costs should be discounted to present value, but counsel did not object on the basis

**2.** Section 538.225.7 provides a remedy for those defendants who question the qualifications of the person who provided the affidavit of merit. The Klotzes' attorney filed an affidavit pursuant to § 538.225, and there is nothing in the record that suggests Dr. Shapiro or MHG objected to the affiant-doctor's qualifications under the statute.

that the damage calculation was speculative.

■ Because Dr. Shapiro and MHG did not object on the basis that the testimony was speculative at trial, that issue is not preserved for this Court's review. *See Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 188–89 (Mo. banc 2009) (citing *State v. Johnson*, 207 S.W.3d 24, 43 (Mo. banc 2006)). Nevertheless, based on the record below, the admission of the expert testimony was not speculative and was well within the trial court's discretion.

Dr. Shapiro and MHG argue that § 538.215, RSMo 2000, required the Klotzes to present the present value of the requested future damages. It is correct that § 538.215 states that the trier of fact is required to express future damages at present value, but there is no authority to support their argument that the Klotzes are obligated to present evidence as to present value.[3]

In fact, this Court rejected a similar argument in *Anglim v. Missouri Pacific R.R. Co.*, 832 S.W.2d 298, 308–09 (Mo. banc 1992). In *Anglim*, this Court recognized that future damages must be reduced to present value in F.E.L.A. cases but held that, because the jury was capable of making a present value reduction without aid of expert testimony, and because the defendant railroad was free to argue the need for the reduction to the jury, the plaintiff was not required to present evidence of present value as part of plaintiff's evidence of future damages. *Id.*

This lack of any requirement of expert testimony to support a present value analysis of future damages was also recognized by this Court in *Bair v. St. Louis–San Francisco Ry. Co.*, 647 S.W.2d 507, 513 (Mo. banc 1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 109 (1983), where this Court stated: "The fact that a dollar today is not the same thing as a dollar payable some years from now, furthermore, is the matter of plainest fact which could be appropriately argued without the need for expert testimony."

There is no specific language in § 538.215 that requires the party plaintiffs to offer their evidence concerning the categories of future damages in terms of present value. Counsel for Dr. Shapiro and MHG admitted during oral argument that he could have offered evidence concerning the present value of the Klotzes' future damages. The trial court specifically advised Dr. Shapiro and MHG that they had permission to tell the jury in closing argument that the Klotzes' future economic damage figures were not reduced to present value and that any such award should be expressed at present value. Similarly, counsel for Dr. Shapiro and MHG could have addressed the issue of present value in closing argument but failed to do so.

Although defense counsel indicated an intention to argue to the jury that the future damages should be reduced to present value, no such argument was made. As this Court stated in *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 388

---

**3.** Section 538.215 in pertinent part states:

1. In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, any damages found shall be itemized by the trier of fact as follows:
(1) Past economic damages;
(2) Past noneconomic damages;
(3) Future medical damages;
(4) Future economic damages, excluding future medical damages; and
(5) Future noneconomic damages.
2. All future damages which are itemized as required by subsection 1 of this section shall be expressed by the trier of fact at present value.

(Mo. banc 1986): "The fact of the matter is that defendants did not make any credible effort to contest the issue of present value. Whether defendants' failure to do so was a result of trial strategy—rooted in the concern that to do so would emphasize or further legitimate plaintiffs' claim of damages—or whether it was tied to some other reason, they now seek relief from the consequences of their own actions."[4]

## Point IV: Admission of Statements from Non-testifying Physicians

Dr. Shapiro and MHG argue that the trial court erroneously admitted into evidence out-of-court statements of two of Mr. Klotz's treating physicians regarding the source of Mr. Klotz's infection.

### Standard of Review

■ The improper admission of hearsay evidence requires reversal only if such evidence was prejudicial. *Dunn v. St. Louis–San Francisco Ry. Co.*, 621 S.W.2d 245, 252 (Mo. banc 1981).

### Analysis

■ Dr. Shapiro and MHG argue that the trial court erred in admitting hearsay evidence. The statements at issue were admitted or alluded to during testimony at three points during trial.

First, the Klotzes' attorney asked their expert witness, Dr. Siegal, an internist cardiologist with a Ph.D. in electrophysiology, about the treating physicians' statements regarding the source of Mr. Klotz's methi-

cillin-resistant Staphylococcus aureus (MRSA) infection that were expressed in a consultation record. Dr. Shapiro's attorney objected on the basis of hearsay. The trial court overruled the objection, allowing the consultation record to be admitted "to the extent that [the Klotzes' attorney could] establish a foundation that experts rely on this kind of information in forming their opinions." The Klotzes' attorney then asked Dr. Siegal to explain two paragraphs in the consultation record. Dr. Siegal explained:

> *Severe endocarditis*—That's the infection of the lining that we discussed— *secondary to,* meaning as a result of, *pacemaker infection,* infection of the permanent pacemaker, *which likely occurred at the time of his implantation,* that's the implantation of the permanent pacemaker in March.

(Italicized portions indicating what Dr. Siegal read from the consultation record).

The second reference to the treating physicians' opinions occurred when the attorney for Dr. Shapiro asked Dr. Siegal whether the treating physicians could have been deferring to Dr. Clark in forming their opinions about the cause of the infection. Dr. Siegal stated that it was "very possible" the treating physicians communicated with Dr. Clark because Dr. Clark worked at the same hospital, and, therefore, their opinions could have been based on deference to a colleague.

4. Dr. Shapiro and MHG argue that the trial court should have given an instruction that they offered that would have required the jury to express any future damages in terms of present value. This claim is not preserved for review for two reasons: (1) "The argument shall be limited to those errors included in the 'Points Relied On.' " Rule 84.04(e); and (2) "If a point relates to the giving, refusal or modification of an instruction, such instruc-

tion shall be set forth in full in the argument portion of the brief." Rule 84.04(e). This argument was not contained in the Points Relied On and the instruction was not set out in full in the argument portion of the brief. Moreover the damage instructions given in this case by the trial court were all in accord with the Missouri Approved Instruction 70.02(b).

The third reference to the treating physicians' opinions occurred when the attorney for Dr. Shapiro asked the expert, Dr. Clark, the following:

Attorney: My question to you is, don't you think it's logical for any doctor in Arizona seeing this patient on April 28th or 29th to presume at least as a starting point that this infectious process probably occurred at or near the time of the implantation, without knowing more?

Dr. Clark: That's correct.

Attorney: So until you know more, that's a good working presumption, fair to say?

Dr. Clark: Sure.

Attorney: Alright. And that would explain why the doctor in Arizona would have written that down, right?

Dr. Clark: I don't know why they wrote it down. I never had any conversation with them.

Attorney: Alright. You didn't have any conversation with them, but I think in your deposition you did tell us that you *imparted my desires and concerns to* [them] through your notes?

Dr. Clark: Yes.

Attorney: And certainly [the treating physicians] would have had access to your notes and your thought process from the records?

Dr. Clark: Correct.

■■■ Dr. Shapiro and MHG argue that the opinions of Mr. Klotz's treating physicians were inadmissible hearsay.[5] Counsel for Dr. Shapiro and MHG stipulated the records were business records and, as noted above, actually elicited a portion of the

testimony counsel now claims should have been excluded. These statements were admissible both under the business records exception to the hearsay rule and under the expert testimony statute.[6]

The admissibility of business records is governed by § 490.680, RSMo 2000, which provides:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

"Medical records relating to observations, treatment, and diagnoses are generally admissible as business records." *Tendai v. Missouri State Bd. of Registration for Healing Arts*, 161 S.W.3d 358, 366 (Mo. banc 2005), *overruled on other grounds by Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423 (Mo. banc 2009). The consultation record in this case was related to diagnosis and treatment and, therefore, was admissible as a business record.

■■■ The trial court, however, allowed the record to be referred to and read on the basis of § 490.065.3 because the record was used as support for Dr. Siegal's expert opinion testimony. Section 490.065.3 provides:

The facts or data in a particular case upon which an expert bases an opinion

---

**5.** Dr. Shapiro and MHG also claim that the admission of the treating physicians' opinions through the consultation records violates their Sixth Amendment right to confrontation. This argument is unfounded. The Sixth Amendment protection only extends to criminal prosecutions. The cases on which Dr. Shapiro and MHG rely all relate to criminal matters. As this is a civil case, no Sixth Amendment violation could have occurred.

**6.** Section 490.065, RSMo 2000.

or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

"The purpose of the 'facts or data' prong of the statute was to bring the legal practice in line with the standard practice exercised by experts in their respective fields." *Lauck v. Price,* 289 S.W.3d 694, 699 (Mo. App.2009). "Medical experts are allowed to 'rely on information and opinions of others provided that those sources are not offered as independent substantive evidence, but rather serve only as a background for his opinion.'" *Id.* "Medical records are the quintessential example of the type of facts or data reasonably relied upon by experts in the field of medicine." *Glidewell v. S.C. Mgmt., Inc.,* 923 S.W.2d 940, 951 (Mo.App.1996). Dr. Siegal and Dr. Clark both testified that the opinions of the treating physicians may have been influenced by Dr. Clark's notes. The admission of the treating physicians' statements was not in error.

## Point V: Cross–Examination about Expert Witness Income

Dr. Shapiro and MHG argue that the trial court erred in refusing to allow them to question the Klotzes' expert, Dr. Belz, about the amount of income he makes from his work as an expert witness.

### Standard of Review

■ "It is well established that the extent and scope of cross-examination in a civil action is within the discretion of the trial court and 'will not be disturbed unless an abuse of discretion is clearly shown.'" *Nelson v. Waxman,* 9 S.W.3d 601, 604 (Mo. banc 2000) (citing *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 868–69 (Mo. banc 1993)).

### Analysis

The Klotzes' attorney sought *in limine* to bar Dr. Shapiro's and MHG's attorneys from questioning the Klotzes' expert witness, Dr. Belz, about how much money he made from sources outside this case for his work as an expert witness. Dr. Shapiro and MHG suggest that the trial court refused to allow them to question Dr. Belz about this income. However, the trial court did not rule on the Klotzes' motion in limine to bar such questions during cross-examination; instead the judge said she would look at the case law and determine whether such questions were permissible.

Here, neither abuse of discretion nor prejudice can be shown because Dr. Belz was in fact questioned about his general work as an expert witness and his specific work on this case. The attorney for SAMC asked Dr. Belz how many times a year he is contacted by attorneys about medical malpractice cases, how many depositions he has given in the past decade in legal matters, how many times he had testified at trial, and how much he charges per hour to review files and to give testimony in medical malpractice cases. The attorney also asked Dr. Belz several specific questions about this case, including his retainer fee, how much he billed the Klotzes' attorney for additional work and how many hours he spent preparing for his deposition and trial testimony.

## Point VI: Displaying Deposition during Closing Arguments

Dr. Shapiro and MHG argue that the trial court erred in allowing the Klotzes to show the jury a printed portion of Dr. Shapiro's deposition during closing arguments because the deposition was not

shown, displayed or read to the jury during trial.

## Standard of Review

 Counsel on both sides are permitted wide latitude and discretion in referring to evidence and arguing inferences during closing argument. *Nelson*, 9 S.W.3d at 606. Generally, the trial court's rulings on closing arguments are reviewed for abuse of discretion. *Trimble v. Pracna*, 167 S.W.3d 706, 715 (Mo. banc 2005) (citing *Nelson*, 9 S.W.3d at 606).

## Analysis

 As part of his closing argument, the Klotzes' attorney showed the jury a portion of Dr. Shapiro's deposition stating that he had prescribed an antibiotic on the presumption that there was an infection involved. Dr. Shapiro and MHG argue that this deposition was never entered into evidence, and, therefore, the trial court erred in allowing it to be used during closing arguments.

 In fact, the portion of Dr. Shapiro's deposition at issue had been read, without objection, during the testimony of defense expert Dr. Beshai. "When evidence of one of the issues in the case is admitted without objection, the party against whom it is offered waives any objection to the evidence, and it may be properly considered even if the evidence would have been excluded upon a proper objection." *Reinert v. Dir. of Revenue*, 894 S.W.2d 162, 164 (Mo. banc 1995). Dr. Shapiro and MHG failed to make a timely objection to the use of Dr. Shapiro's deposition when it was first read at trial; therefore, they waived their objection to the use of the deposition during closing arguments.

## Point VII: Jury Instruction

Dr. Shapiro and MHG argue that Jury Instruction 9, the verdict director, was improper because the words "added risk of infection" are vague, overbroad and resulted in a roving commission.

## Standard of Review

 Whether a jury was instructed properly is a question of law that this Court reviews *de novo*. *Bach v. Winfield–Foley Fire Protection Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008) (citing *Harvey v. Washington*, 95 S.W.3d 93, 97 (Mo. banc 2003)). Review is conducted in the light most favorable to the submission of the instruction, and if the instruction is supportable by any theory, then its submission is proper. *Id.* (citing *Oldaker v. Peters*, 817 S.W.2d 245, 251–52 (Mo. banc 1991)). Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action. *Id.*

## Analysis

 "A 'roving commission' occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury 'to roam freely through the evidence and choose any facts which suit [ ] its fancy or its perception of logic' to impose liability." *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 482 (Mo. banc 2005) (citing *Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 463 (Mo. banc 1998)). Instruction 9 stated:

> In your verdict, you must assess a percentage of fault to defendants Michael Shapiro, MD and Metro Heart Group, whether or not St. Anthony's Medical Center was partly at fault, if you believe:
>
> First, defendant Michael Shapiro, MD either:

failed to properly treat the right wrist symptoms in connection with the placement of the permanent pacemaker, or

failed to inform James Klotz of an added risk of infection due to the right wrist signs and symptoms before implanting the permanent pacemaker, and

Second, defendant Michael Shapiro, MD, in any one or more respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to Plaintiff James Klotz.

Dr. Shapiro and MHG contend that the phrase "added risk of infection" was so vague that it allowed the jury to impose liability based on facts not supported by the evidence. A verdict director, like an instruction, should not misdirect, mislead, or confuse the jury. *Edgerton v. Morrison*, 280 S.W.3d 62, 67 (Mo. banc 2009). The issue is whether the phrase as used in the verdict director was misleading in the context of the evidence at trial. *Id.* at 66. Dr. Shapiro and MHG fail to explain adequately how the instruction prejudiced them and do not explain what is vague about the term "added risk of infection" or how the jury might have misinterpreted it. Nevertheless, it is clear based on a review of the record that the phrase "added risk of infection" was explained thoroughly by the expert testimony at trial.

Where the testimony in a case explains a phrase used in the verdict director, there is no "roving commission." *Id.* at 67. Here, the Klotzes' expert, Dr. Siegal, and Dr. Shapiro both testified about the possibility that an infection at the IV site could increase the risk of infection when the pacemaker was implanted. The expert testimony sufficiently ex-

plained the phrase "added risk of infection," and this phrase was understandable to a jury without further definition.

## Point VIII: Overruling the Motion for Mistrial

Dr. Shapiro and MHG argue that the trial court erred in overruling their motion for mistrial when the jury was deadlocked and in providing a second "hammer" instruction.

### Standard of Review

Whether a jury was instructed properly is a question of law that this Court reviews *de novo*. *Bach*, 257 S.W.3d at 608 (citing *Harvey v. Washington*, 95 S.W.3d at 97). The decision, in the face of a deadlock in civil cases, to declare a mistrial or urge the jury to continue deliberating is within the discretion of the trial court. *Nash v. Plaza Elec., Inc.*, 363 S.W.2d 637, 641 (Mo.1962). Further, instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action. *Bach*, 257 S.W.3d at 608. Oral instructions that encourage a civil jury to reach a verdict are proper so long as they do not coerce the verdict. *Nash*, 363 S.W.2d at 641.

### Analysis

The jury began deliberations at 11:00 a.m., and at 3:55 p.m. the jury sent a note to the judge stating, "We as 8 juror[s] have come to an agreement. 1 juror is holding out. 3 are not in agreement. We are at a standstill." At 4:10 p.m., the judge, without objection, sent an instruction reading:

You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have

them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instruction of the Court, nor find as a fact that which under the evidence and his/her conscience he/she believes to be untrue.

Shortly thereafter, the jury sent a second note asking for the "Life Care Report," which was provided. At 5:15 p.m. the jury sent a third note, stating "Juror # 2 will not come to a reasonable conclusion. Will only settle for 3,000,000 and we as 8 feel 2.5 is adequate." At this point, Dr. Shapiro and MHG requested a mistrial because of deadlock. The court refused to grant a mistrial. The trial judge told the attorneys that she either could bring the jurors into the courtroom or go to the jury room with the court reporter. The attorneys responded that they were at the court's discretion, and none of the attorneys objected to the judge speaking to the jurors. The judge went to the jury room with the court reporter to urge the jury to continue to deliberate and try to reach a verdict. The judge told the jurors they could deliberate until 6 p.m. and, if they had not reached a verdict by then, they could return in the morning to continue deliberations. At 5:55 p.m., the jury returned its verdict, signed by nine jurors.

 Dr. Shapiro's and MHG's attorneys did not object to the court's encouragement that the jurors attempt to reach an agreement. This failure to object constitutes a waiver of their claim of error. *Nash,* 363 S.W.2d at 640. Furthermore, a court's oral instructions to a jury regard-

ing its duties and powers when a jury is deadlocked are proper. *Id.* at 641; *Anderson v. Bell,* 303 S.W.2d 93, 100 (Mo. 1957). A court may remind jurors of the importance of reaching an agreement as long as the court's commentary does not rise to the level of coercion. *Nash,* 363 S.W.2d at 641; *Anderson,* 303 S.W.2d at 100. Here, Dr. Shapiro and MHG do not point to any facts suggesting that the verdict was coerced, and there is no indication in the record that the verdict was coerced. It is undisputed that the judge gave the jurors the option to end deliberations for the day and return in the morning.[7]

Dr. Shapiro and MHG contend that the trial court's instructions to the jury were in error because they were not given to the jury in writing. A written "hammer" instruction modeled after MAI–CR1.10 (a criminal instruction) was given after the jury's first note to the trial court. This instruction has been held to be appropriate in civil cases. *See Klein v. General Elec. Co.,* 714 S.W.2d 896, 906 (Mo.App.1986). Dr. Shapiro and MHG suggest that, because the "hammer" instruction must be given in writing during criminal trials, all comments to the jury must be given in writing. This Court has repeatedly upheld the giving of oral instructions regarding the importance of reaching an agreement and reminding jurors of their duties and powers. *See Nash* 363 S.W.2d at 641; *Anderson,* 303 S.W.2d at 100.

 Finally, Dr. Shapiro and MHG make the unsupported claim that by encouraging the jury to reach a verdict, the trial court violated their rights to due process and a fair trial. Dr. Shapiro and MHG do not explain how their constitutional rights were violated, nor do they cite

---

7. Specifically, the judge said: "[G]ive it another 45 minutes or so unless you want to just call it quits now and come back tomorrow morning. I'll let you guys decide what you want to do."

any cases supporting their position. *See Jackson County v. State*, 207 S.W.3d 608, 614 (Mo. banc 2006).

## Point IX: Overruling the Motion for Directed Verdict and/or Motion for Judgment Notwithstanding the Verdict

Dr. Shapiro and MHG argue that the Klotzes did not make a submissible case because they failed to prove that the alleged negligence caused injury to Mr. Klotz; therefore, they contend, the trial court should have granted Dr. Shapiro's and MHG's motions for directed verdict and/or judgment notwithstanding the verdict.

### Standard of Review

 The standard of review of denial of a judgment notwithstanding the verdict is essentially the same as for review of the overruling of a motion for directed verdict. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence. *Id.* (citing *Houghton v. Atchison, Topeka & Santa Fe R.R. Co.*, 446 S.W.2d 406, 409 (Mo. banc 1969)). In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury. *Id.* This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Id.*

### Analysis

 Dr. Shapiro and MHG argue that the Klotzes failed to prove any causal connection between the alleged negligence and the injury that was claimed, and they contend that the expert testimony on which the Klotzes relied was mere conjecture or speculation. Viewing the evidence in the light most favorable to the jury's verdict, it is clear that the evidence presented was sufficient to support the jury's conclusion.

Two experts, Dr. Siegal and Dr. Clark, testified that Dr. Shapiro's actions were below the standard of care. Dr. Siegal testified that Dr. Shapiro's failure to treat Mr. Klotz's wrist infection in a timely manner with antibiotics or to obtain an infectious disease consultation was below the standard of care and that Dr. Shapiro's failure to inform Mr. Klotz of an added risk of infection due to the wrist condition was also below the standard of care. Dr. Siegal further testified that these failures directly caused or contributed to cause the pacemaker infection, sepsis and amputation. Dr. Clark testified that Dr. Shapiro's failure to treat the wrist infection in a timely manner with antibiotics or to get an infectious disease consultation before implanting the pacemaker was below the standard of care and that this failure caused or contributed to cause the pacemaker infection, sepsis and amputation.

 The verdict director stated that the jury must assess a percentage of fault against MHG and Dr. Shapiro if they believed that Dr. Shapiro either failed to properly treat Mr. Klotz's right wrist symptoms or failed to inform Mr. Klotz of an added risk of infection due to the right wrist condition. Dr. Siegal testified that Dr. Shapiro should have informed Mr. Klotz that there was a risk of infection if the pacemaker was implanted immediately rather than after several days of intravenous antibiotics. "[O]nce the jury is told what a proper warning would have consisted of, it knows what the patient would have known when deciding what course to follow, and thus it has all the information it needs to make the determination as to

what option a reasonable person in Plaintiff's situation would have followed." *Wilkerson v. Mid–Am. Cardiology,* 908 S.W.2d 691, 698–99 (Mo.App.1995). The jury had sufficient evidence to determine that all of the alternative theories of liability set forth in the verdict directing instruction were supported by the evidence.

## Point X: Speculative Evidence

Dr. Shapiro and MHG argue that the trial court erred in allowing evidence that was speculative, to their detriment and prejudice.

### Standard of Review

■ Trial courts have broad discretion over the admissibility of evidence, and appellate courts will not interfere with those decisions unless there is a clear showing of abuse of discretion. *Hancock v. Shook,* 100 S.W.3d 786, 795 (Mo. banc 2003); *Nelson,* 9 S.W.3d at 604.

### Analysis

■ Dr. Shapiro and MHG argue that the trial court erred in allowing testimony regarding Dr. Shapiro's knowledge of SAMC's infection rates, claiming that such evidence was speculative and assumed facts not in evidence. Two witnesses, Dr. Clark and Dr. Septimus, testified about whether Dr. Shapiro would have seen an antibiogram in his role as a doctor at SAMC. Antibiograms are reports that detail data about the number and type of infections at a specific hospital. Dr. Clark testified that, in his experience, such data was normally shared with doctors at his hospital. Dr. Septimus testified that, in his experience, such data is given to doctors at the end of the year. Counsel for Dr. Shapiro and MHG objected to this testimony on the bases of speculation and lack of foundation.

The fact that Dr. Shapiro denied knowledge of this data did not preclude admission of this evidence. The jury was free to disbelieve Dr. Shapiro's denial of knowledge. *See Georgescu v. K Mart Corp.,* 813 S.W.2d 298, 299 (Mo. banc 1991). Further, this information was relevant to show how Dr. Shapiro could have discovered the risk of an MRSA infection and used this information to help Mr. Klotz make an informed decision about proceeding with surgery. The testimony of both experts was based on their personal experiences as doctors regarding the accessibility of antibiogram reports in hospital settings. The evidence was not speculative. The fact that Dr. Shapiro may not have appropriately appreciated the extent of the risk of infection does not make inadmissible evidence showing that he should have understood that risk. The trial court did not err in admitting this testimony.

## Point XI: Testimony about Medical Bills

■ Dr. Shapiro and MHG argue that the trial court erred in allowing evidence to be presented about medical bills that had not been paid or had been adjusted on behalf of the Klotzes. Dr. Shapiro and MHG argue that the trial court ignored the requirements of § 490.715.5(2), RSMo 2000, which they claim creates a presumption that the amount paid to a medical provider represents the value of medical treatment rendered and, therefore, the court must present the lesser amount to the jury. In other words, Dr. Shapiro and MHG read into § 490.715.5(2) an irrebuttable presumption even though the statute expressly provides for a rebuttable presumption.

In relevant part, § 490.715.5 provides:

(1) Parties may introduce evidence of the value of the medical treatment rendered to a party that was reasonable,

necessary, and a proximate result of the negligence of any party.

(2) In determining the value of the medical treatment rendered, there shall be a rebuttable presumption that the dollar amount necessary to satisfy the financial obligation to the health care provider represents the value of the medical treatment rendered. Upon motion of any party, the court may determine, outside the hearing of the jury, the value of the medical treatment rendered based upon additional evidence, including but not limited to:

(a) The medical bills incurred by a party;

(b) The amount actually paid for medical treatment rendered to a party;

(c) The amount or estimate of the amount of medical bills not paid which such party is obligated to pay to any entity in the event of a recovery.

\* \* \*

Here, Dr. Shapiro and MHG filed a motion *in limine* to determine, pursuant to § 490.715.5(2), the amount of medical bills that would be submitted to the jury. The Klotzes filed a response, and the trial court held a hearing on the issue. Substantial evidence was presented at the hearing showing that liens were being asserted against the Klotzes for the difference between the amount billed and the amount of insurance paid. Moreover, evidence was also presented that the Klotzes signed agreements with two providers stating that they were responsible for amounts charged regardless of what insurance paid. This was more than adequate evidence under § 490.715.5(2) to demonstrate the higher value of the medical treatment rendered.

The trial court issued the following order:

After reviewing all memoranda and upon consideration of the oral argument of the parties, the Court finds Plaintiffs have rebutted the presumption with regard to those bills in which a reduced amount was accepted by the provider because Plaintiffs presented expert testimony the bills were reasonable, Plaintiffs are still subject to liens for unpaid bills, and the medical providers have not provided any release of obligation by Plaintiffs to pay for any amounts charged, but not received, by provider.

The evidence on which the court relied was appropriately considered under § 490.715.5(2). The trial court did not err in allowing testimony about the full amount charged for medical bills.

### Conclusion

For the foregoing reasons, the judgment is reversed, and the cause remanded to the trial court to enter a judgment in accord with the jury's verdict.

PRICE, C.J., RUSSELL, BRECKENRIDGE, FISCHER and STITH, JJ., concur

WOLFF, J., concurs in separate opinion filed.

TEITELMAN, J., concurs in result in separate opinion filed.

MICHAEL A. WOLFF, Judge, concurring.

### Introduction

Does a legislated limit on damages in actions for personal wrongs—which were triable to juries when Missouri's constitution was adopted—violate the constitutional guarantee that the right to trial by jury "shall remain inviolate?"

I agree with the unanimous conclusion in the *per curiam* opinion that this case is governed by *State ex rel. St. Louis–San*

*Francisco Ry. Co. v. Buder,* 515 S.W.2d 409 (Mo.1974), because, as to James and Mary Klotz, the 2005 statutory limit on non economic damages—enacted after James Klotz suffered his injury—is a law "retrospective in operation" in violation of article I, section 13 of the Missouri Constitution.

The jury found the hospital, the medical group and the individual physician liable for negligence in the care of James Klotz that caused sepsis (a serious infection spread through the bloodstream), organ failure and amputation of a limb. The jury's award of $2,067,000 to James Klotz, included noneconomic damages—for such things as pain, suffering, disfigurement and loss of capacity to enjoy life [1]—in the amount of $760,000. The jury determined that damages to Mary Klotz, his wife, totaled $513,000, which included $329,000 in noneconomic damages for loss of consortium.[2] The jury assessed 33 percent of the fault to the hospital and 67 percent to the physicians' group and the individual doctor. The trial court concluded that the limits on noneconomic damages in the pre–2005 version of section 538.210 applied to the hospital and, therefore, did not reduce the 33 percent of the verdict attributable to the hospital because the amount did not exceed the pre–2005 limits. As to the physician's group and the individual doctor, however, the trial court determined that the new version of section 538.210 applied and, accordingly, reduced James Klotz's noneconomic damages against the physician defendants from $509,200 to $234,500, and reduced Mary Klotz's noneconomic damages award of $220,430 against the physician defendants to $0.

Today's decision covers this case and, perhaps, only this case. It is now nearly five years since the limit in section 538.210, RSMo Supp.2006, was enacted and this is the first case to reach this Court that challenges the 2005 law. Today's decision applies only to cases in which the cause of action accrued before August 28, 2005, which were tried after August 28, 2005; and in which the verdict for noneconomic damages exceeded the new limit of $350,000 but was within the former limit of $579,000. There undoubtedly are few such cases, and, at this point, few, if any, remain that accrued before August 28, 2005.[3]

---

1. "Noneconomic damages" are defined in section 538.210, RSMo. Supp. 2008, as "damages arising from nonpecuniary harm including, without limitation, pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium but shall not include punitive damages." "Economic damages" are defined as "damages arising from pecuniary harm including, without limitation, medical damages, and those damages arising from lost wages and lost earning capacity."

2. The spouse of a person who sustains injuries as a result of an actionable tort can file a claim for loss of consortium. Loss of consortium includes loss of affection, companionship and conjugal rights. *Novak v. Kansas City Transit, Inc.,* 365 S.W.2d 539, 542 (Mo. 1963).

3. The filings and number of jury trial verdicts in medical malpractice cases per fiscal year

have diminished somewhat since the 2005 law took effect. In the current decade, more than 350,000 civil cases have been filed per year in the circuit courts, of which there are about 7,000 to 9,000 personal injury cases, except for the year when "tort reform" took effect, when the number of filings jumped to nearly 15,000. Reported in the statistical supplements to the judiciary's annual reports, online at http://www.courts.mo.gov/page.jsp?id=35027 (accessed March 8, 2010).

Medical malpractice cases in circuit courts are a relatively small portion of all civil cases. Here are the numbers for medical malpractice cases, from the Office of State Courts Administrator:
- Fiscal 2004: 839 cases filed; 51 jury trial verdicts
- Fiscal 2005: 780 cases filed; 35 jury trial verdicts

There is a fundamental flaw in the legislated limits on jury verdicts in section 538.210, which is well known but which is not addressed in today's opinion. And so, I take the liberty to write individually to explain the issue that the court one day will have to confront—that the limit on a jury's determination of damages violates the constitutional guarantee in article I, section 22(a) that "the right of trial by jury as heretofore enjoyed shall remain inviolate."

The constitutional problem inherent in this limit on a jury's decision regarding damages should be identified at the earliest possible time so that the General Assembly may take appropriate steps, if it chooses, to bring its enactment within constitutional bounds or propose to the people that the constitution be changed.

The General Assembly enacted the limits on noneconomic damages in response to what it perceived as a serious problem in the tort and insurance liability system. The legislation attempts to address that problem—called a "crisis" by many—by essentially limiting the constitutional right to trial by jury. This it cannot do. The voters of this state are the only ones empowered to change the constitution.

I take the defendant doctors' point, supported by various friend-of-the-Court briefs, that the legislature considered malpractice litigation to be a crisis, but it seems a rather slow-moving crisis, more a trickle than a flood. Perhaps the reduction in numbers of claims since 2005 results from deterring claims on behalf of the elderly, the disabled and those (mostly women) who do not work outside the home. Their damages typically would be

- Fiscal 2006: 1,232 cases filed; 67 jury trial verdicts (includes August 28, 2005, effective date of the new law)
- Fiscal 2007: 502 cases filed; 58 jury trial verdicts

more noneconomic than economic, given that the elderly, the disabled and those who do not work outside the home typically have little or no employment income. This, however, would be a point made by opponents of the legislation. Proponents of damages limits may be loathe to note the possible adverse effects on the elderly, the disabled and homemakers (an out-of-date word, perhaps, but the reader will get the point). Nonetheless, in a case where there is no way to avoid the issue, the Court will be required to respond by delineating the constitutional boundaries in legislatively dealing with the crisis. Today's decision defers consideration of the issue until another verdict comes along in which the non-economic damages exceed the current $350,000 limit in section 538.210.

In enacting the new version of section 538.210, the General Assembly, unfortunately, may well have been guided by this Court's decision in *Adams By and Through Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. banc 1992). *Adams* was a medical malpractice case in which the plaintiff's noneconomic damages were capped pursuant to the 1986 version of section 538.210. The Court reasoned that because section 538.210 statutorily prescribes the damage remedy, it is a matter of law for the court and not for the jury. *Id.* at 907.

The best that can be said for *Adams* is that it arose from the flawed view, then prevalent, that the right to trial by jury could be modified or abolished legislatively in particular cases. For instance, *State ex rel. Tolbert v. Sweeney*, 828 S.W.2d 929 (Mo.App.1992), decided earlier in the same year as *Adams*, held that there was no

- Fiscal 2008: 516 cases filed; 49 jury trial verdicts
- Fiscal 2009: 604 cases filed; 37 jury trial verdicts

right to trial by jury in employment discrimination cases for damages under the human rights act because the legislation had not provided for a jury trial. In fact, an earlier version of the act had been vetoed by the governor because it explicitly had provided for a jury trial in such cases; a revised version—without a provision for jury trial—was signed into law. *Id.* at 931. After *Tolbert* there were no jury trials in state courts in employment discrimination cases for damages until after this Court unanimously held 11 years later in *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 85 (Mo. banc 2003), that there is a right to a jury trial in court actions for damages that cannot be legislated away.[4]

"The right to trial by jury," this Court held in *Diehl*, "is a constitutional right, applies 'regardless of any statutory provision,' and is 'beyond the reach of hostile legislation.'" *Id.* at 92 (citing *Lee v. Conran*, 213 Mo. 404, 111 S.W. 1151, 1153 (1908)).

The limit on juries under section 538.210 did not exist at common law or in statutes when the people of Missouri adopted their constitution in 1820 guaranteeing that the right to trial by jury as heretofore enjoyed shall remain inviolate.

The limit on noneconomic damages violates the right to trial by jury; it overrules the jury's determination of a factual issue in a way that was unrecognized at common law when the constitutional right was adopted by the people in 1820. The constitutional status of the right to trial by jury can be changed only by the people

voting affirmatively for such a change in their constitution. Mo. Const. art. XII.

Accordingly, *Adams'* fundamental error is in concluding that statutory law can trump the constitutional right to jury trial. This Court should overrule *Adams* to restore the right to trial by jury to its traditional and vital place in our constitutional system.

### The Right of Trial by Jury

Article I, section 22(a) of the Missouri Constitution is very simple; it is one of the guarantees in Missouri's bill of rights. It says: "That the right of trial by jury as heretofore enjoyed shall remain inviolate; . . . ."

This simple language provokes two questions:

1. What was the right of trial by jury *as heretofore enjoyed?* This phrase requires a review of what the right to trial by jury meant as of the time of the original Constitution of Missouri in 1820. The 1820 Constitution in art. XIII, sec. 8 provided: "That the right of trial by jury shall remain inviolate." The Constitution of 1875 added the phrase "as heretofore enjoyed." This language means that "[c]itizens of Missouri are entitled to a jury trial in all actions to which they would have been entitled to a jury when the Missouri Constitution was adopted." *Hammons v. Ehney*, 924 S.W.2d 843, 848 (Mo. banc 1996) (citations omitted); *Diehl*, 95 S.W.3d at 85.[5]

---

**4.** *Diehl* overruled *Tolbert, Pickett v. Emerson Electric Co.*, 830 S.W.2d 459 (Mo.App.1992), and *Wentz v. Industrial Automation*, 847 S.W.2d 877 (Mo.App.1993), denying the right of trial by jury in such cases. This court relied on *Diehl* in its decision preserving the right to trial by jury of actions at law in cases involving mixed claims at law and in equity.

*See State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462 (Mo. banc 2004).

**5.** *See also State ex rel. Peper v. Holtcamp*, 235 Mo. 232, 138 S.W. 521 (1911) (The word "heretofore" means before and up to the time the constitution was adopted).

2. Does the right to trial by jury—when the legislative limit is applied—*remain inviolate?* "Inviolate" means free from change or blemish, pure or unbroken. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1190 (1993). The phrase is stark and unequivocal in its demand that the right to trial by jury not be changed by judicial misuse or statutory infringement. This choice of words—"remain inviolate"—as this Court said in *Diehl,* "is a more emphatic statement of the right than the simply stated guarantee written some 30 years earlier as the 7th Amendment to the United States Constitution that' ... the right of trial by jury shall be preserved....'" 95 S.W.3d at 84.

### 1. What was the right of trial by jury "as heretofore enjoyed"?

Missouri's territorial laws that pre-dated statehood provided for jury trials in "all civil cases of the value of one hundred dollars ... if either of the parties require it." Mo. Terr. Laws 58, sec. 13; *Diehl,* 95 S.W.3d at 85. Civil actions for damages resulting from personal wrongs have been tried by juries since 1820. *Diehl,* 95 S.W.3d at 92. This case falls into that category.

To determine what the right—*as heretofore enjoyed*—meant at common law, a review of the history of the right to jury trial, and particularly the manner in which

jury verdicts were controlled or limited at common law, is required.[6]

### Some early common law history

Juries prior to the 1400s often found verdicts based on their personal knowledge of the events of the case without hearing any evidence or witnesses.[7] It also became commonplace for the parties to pay the expenses of a juror's time in court, but fears arose as to the possibility of corrupt practices.[8] Therefore, if a jury returned a verdict that was clearly false compared to its knowledge of the case, the jurors were punished through a writ of attaint:

> All of the first jury shall be committed to the King's prison, their goods shall be confiscated, their possessions seized into the King's hands, their habitations and houses shall be pulled down, their woodland shall be felled, their meadows shall be plowed up and they themselves forever thenceforward be esteemed in the eye of the law infamous.[9]

By the late 1400s and 1500s, jurors heard evidence and the testimony of witnesses who were examined and cross-examined—and jurors began to render verdicts based on the evidence in court instead of their own knowledge.[10] From this change, the writ of attaint to punish perjuring or dishonest jurors became obsolete. Some judgments were simply errors as to the evidence or a misunderstanding of the law. Hence there arose a need for a way to revise jury verdicts without punishment.

---

6. Missouri's common law is based on the common law of England as of 1607. Section 1.010, RSMo 2000. Joseph Fred Benson, *Reception of the Common Law in Missouri: Section 1.010 as Interpreted by the Supreme Court of Missouri,* 67 Mo. LAW. REV. 595 (2002).

7. For a complete discussion of the history of jury trials, see Theodore F.T. Plucknett, A

CONCISE HISTORY OF THE COMMON LAW 106–138 (5th ED.1956).

8. Plucknett at 131.

9. *Id.* (citing Fortescue, *De Laubidus,* cap. xxvi).

10. Plucknett at 132–133.

As for interfering with jury verdicts, it was rare for the courts to grant a new trial in the medieval times unless there was jury misconduct such as eating and drinking before returning their verdict.[11] It also was rare for the courts to interfere with a jury verdict. In a 1615 case, it was declared that " 'jurors are chancellors' in the matter of assessing damages, and entitled to use an uncontrolled discretion." [12] No one outside of the judicial system interfered.

The writ of attaint—issued by a judge in calling in another jury to test the verdict of the first jury and to punish jurors for incorrect or corrupt verdicts—fell into disuse after the decision in *Bushell's Case* in 1670. In that case, William Penn (later a colonist of some note and founder of Pennsylvania) and William Meade were charged with unlawful assembly when Penn, a Quaker, challenged suppression of his religious teaching. Bushell was a member of the jury that found Penn not guilty—despite the judge's instruction to find Penn guilty. The judge, who also was the Lord Mayor of London, ordered Bushell to pay a fine; when he refused, the judge sent him to jail without "meat," "drink" or "tobacco." The judge said "we shall have a verdict, by the help of God, or you shall starve for it." [13] The judge's decision was reversed on appeal.

Thereafter judges came to exercise control over juries by granting new trials in cases where the verdict was deemed inconsistent with the evidence.[14]

The common law precedents involving the judge's power to grant a new trial, or order remittitur, are reviewed in *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935). The analysis of the right to jury trial in federal courts under the 7th Amendment to the United States Constitution is the same historical analysis as that required for Missouri's right to jury trial. *Diehl,* 95 S.W.3d at 84–85. The 7th Amendment, guaranteeing the right to jury trial in civil cases, says that "the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." The right to jury trial in federal courts is determined as to the incidents of jury trials in 1791, when the 7th Amendment was adopted, whereas the Missouri analysis uses 1820, the year the Missouri Constitution first was adopted. *Diehl,* 95 S.W.3d at 84–86. In *Dimick,* the Supreme Court could find little support at common law for a judge's revision of a jury's verdict as to damages. The Supreme Court, however, cited a decision by Justice Story in 1822, sitting as a circuit judge, granting a new trial unless the plaintiff remitted a portion of the damages. 293 U.S. at 482–483, 55 S.Ct. 296. This remittitur procedure has been followed since in the federal courts.

For present purposes, it suffices to note that there is a history of courts' reluctance to grant even to judges—who have heard the same evidence as the jury—the power to order a new trial if the plaintiff does not accept a remittitur. The decisions upholding remittitur have the practical effect, in many cases, of avoiding the expense of a new trial—the kind of pragmatism that runs through the common law.

**Missouri's common law precedents**

The right to trial by jury under the Missouri Constitution refers to the inci-

---

11. Plucknett at 135.

12. *Id.* (citing *Hixt v. Goats,* 1 Rolle, 257).

13. Hans Fantel, WILLIAM PENN: APOSTLE OF DISSENT 117–124 (1974). *See also* Godfrey Lehman, THE ORDEAL OF EDWARD BUSHELL (1996).

14. Plucknert at 135.

dents of jury trial—and the methods for controlling jury verdicts—at common law in 1820. *Diehl,* 95 S.W.3d at 85. The right to trial by jury "means that all the substantial incidents and consequences which pertained to the right of trial by jury, are beyond the reach of hostile legislation, and are preserved in their ancient substantial extent as existed at common law." *Lee,* 111 S.W. at 1153. The function of the jury is fact-finding, which includes a determination of the amount of plaintiff's damages.

This concept of the jury as the fact finder is rooted in Missouri's history [15] as is the idea that its verdict should not be disturbed. For instance, *Steinberg v. Gebhardt* involved a contract dispute, and the jury, finding for the plaintiff, set damages at $25. 41 Mo. 519, 519 (1867). On defendant's appeal, this Court said, "It is not the province of this court to weigh the testimony for the purpose of ascertaining whether the jury found too much or too little. . . . [T]he court very properly told the jury that it was their province to find the amount of damage, if any had been sustained. . . . [T]he jury found for the plaintiff in the sum of twenty-five dollars, and we shall not disturb the verdict." *Id.* at 519.

As remittitur came to be used, the judge would ascertain what amount less than the entire verdict was supported by the evidence and grant a new trial unless the prevailing plaintiff agreed to accept the remitted sum. Throughout Missouri's judicial history, remittitur—though recognized from the earliest years of statehood—was not always in favor, and the decisions of this Court were not always consistent.[16] Missouri cases in the early 1800s seemed to allow remittitur when the jury awarded damages that were greater than the amount requested.[17] In the first year of statehood, this Court said in *Carr & Co. v. Edwards* that "if the jury find greater damages than the plaintiff has counted for, the Court render judgment according to such finding, it is error." 1 Mo. 137, 137(1821). In *Carr,* the circuit court rendered judgment in an amount greater than asked, and the judgment was reversed without reference to the doctrine of remittitur. *Id.* at 137.

In the 1852 case of *Hoyt v. Reed,* the trial court determined that the high damage amount was the result of jury error in including an item for which it was understood that the defendant was not liable.

---

15. In 1849, Missouri became one of the first states to adopt the Field Code reforming common law pleading and practice. *See* Lawrence M. Friedman, *A History of American Law* 340 (1973). Article XIII, section 6 of Missouri's Field Code read, "[W]henever in an action for the recovery of money only, of specific real or personal property, there shall be an issue of fact, it must be tried by a jury, unless a jury trial is waived. . . ." Ten years later, Missouri abolished the common law practice that permitted the judges to comment about the evidence to the jury and give opinions about the witnesses. Friedman at 347. *See also The Changing Role of the Jury in the Nineteenth Century,* 74 YALE L.J. 170, 173 (1964). In 1879, the General Assembly enacted section 3600, RSMo, codifying article XIII, section 6 of the Field Code.

16. *See* Samuel R. Gardner, *Comment: Power of the Appellate Court of Missouri to Order Remittiturs in Unliquidated Damage Cases,* 17 Mo. L.REV. 340, 341 (1952) ("[I]n the early decisions around 1900, the court was very much in doubt as to the validity of such power in unliquidated damage actions.") (citations omitted). Much of the review of Missouri's case law regarding remittitur is taken from Gardner at 340–348.

17. *Id. See also Johnson v. Robertson,* 1 Mo. 615, 615 (1826) (citing 2 Sellon's Practice, 408) ("But then the law on [the judgment being a greater sum than the damage laid in the declaration] is, that this court will let the party remit the excess.").

16 Mo. 294, 294 (1852). Instead of ordering a new trial, the court remitted the damages. *Id.* On appeal, this Court stated that the denial of a new trial and remittitur was appropriate. *Id.* Three years later, the Court refused to remit damages in a slander case, finding that they were not excessive. *Woodson v. Scott*, 20 Mo. 272, 272 (1855). The Court stated, "[T]he juries of the country are the most appropriate judges of the amount of injury sustained; and to them is properly assigned the authority, and right to assess the consequent amount of damages therefor." *Id.* at 273.

In the late 1800s, it appeared that courts were willing to apply the doctrine of remittitur. Yet in the 1891 case of *Gurley v. Mo. Pac.*, the Court said that use of remittitur infringed on the right to trial by jury. 104 Mo. 211, 16 S.W. 11 (1891). There, the Court refused to remit the damages in a personal injury case and reversed the judgment remanding the case. The Court based its refusal on its lack of power to assess damages. "When we set aside any part of the verdict, we destroy its integrity, and we have no right to set ourselves up as triers of facts, and render another and different verdict." *Id.* at 17. The Court felt that if a jury verdict was clearly based on passion or prejudice, the proper remedy was to set it aside in its entirety, but that absent such passion or prejudice, it should be upheld. The Court also stated that the damages were excessive, seeming to imply that an excessive verdict results from the passions or prejudices of the jury. After *Gurley*, the courts again went back and forth through the end of the 19th century regarding whether the courts had the power to order remittitur.[18] Over the next several decades, Missouri courts continued to apply the doctrine of remittitur.

But this Court, after reviewing the varying and uneven results produced by decades of remittitur rulings, ended (temporarily, at least) the practice of remittitur in *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo. banc 1985). The use of remittitur, the Court said, "constitutes an *invasion of the jury's function by the trial judge* .... Its application in the appellate courts has been questioned since its inception in Missouri as an *invasion of a party's right to a trial by jury* and an assumption of the power to weigh the evidence, a function reserved to the trier(s) of fact." *Id.* (emphasis added).

As part of a series of "tort reform" statutes passed in 1986, section 537.068 said that a court "may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." After the statute was enacted, this Court in Rule 78.10 reinstated a remittitur procedure, modeled on common law practice, that premises remittitur on the court's authority to grant a new trial, a practice consistent with the understanding at common law of the judge's power to control verdicts at the time of the Missouri Constitution was adopted.[19]

---

18. *See Burdict v. Mo. Pac. Ry.*, 123 Mo. 221, 27 S.W. 453, 458 (1894) (the Court did have the power to order remittitur in personal injury cases when damages are excessive); *Rodney v. St. Louis S. W. Ry.*, 127 Mo. 676, 30 S.W. 150, 150 (1895) (the Court did not have the power to order remittitur in personal injury cases).

19. Rule 78.10 provides:
 (a) Any party requesting additur or remittitur shall file a motion for such relief within the time prescribed by Rule 78.04 for filing a motion for new trial.
 (b) If the court sustains the motion in whole or in part, the court's order shall afford each party opposing such relief the

**Does the right to trial by jury—when the legislative limit is applied—*remain inviolate?***

From the foregoing historical summary, it is evident that the courts of this state, under the right to trial by jury "as heretofore enjoyed," have recognized only one power to rein in an excessive verdict—the granting of a new trial or the granting of a remittitur that is premised on the court's power to grant a new trial.

The right "as heretofore enjoyed" applies to actions at common law that were recognized as being subject to the right to jury trial in 1820, when the state's original constitution was adopted. There have been instances in which limits on damages validly have been imposed on jury-tried cases when the cause of action was unknown at common law, such as wrongful death actions, *Demattei v. Missouri–Kansas–Texas R. Co.*, 345 Mo. 1136, 139 S.W.2d 504, 505 (1940), or suits for damages against the state as sovereign, section 537.610, RSMo Supp.2009; *see State ex rel. Cass Medical Center v. Mason*, 796 S.W.2d 621, 623 (Mo. banc 1990). The General Assembly also has enacted remedies that displace damages actions altogether, in workers compensation proceedings, which substitute administrative proceedings for common law damages actions. This change was found unobjectionable in *De May v. Liberty Foundry Co.*, 327 Mo. 495, 37 S.W.2d 640, 648 (1931).

But in this case, the legislation, section 538.210, retains the common law action but displaces the finding of the juries with a legislated limitation on damages.

Remittitur by judges appears to have been well recognized at common law in 1820, though courts occasionally have held that remittitur violates the constitutional right of a trial by jury. There is, of course, a key difference between legislated damages limits and remittitur: With remittitur, the court offers a reduced jury award based on the evidence in a particular case, and the plaintiff is free to reject the offer and obtain a new jury trial. Damage caps, on the other hand, arbitrarily reduce the amount of a jury's award in an entire class of cases without any refer-

option to file an election of a new trial. The election of a new trial shall be filed within 30 days of the date of the order. The order sustaining the motion shall specify whether the new trial will be on damages or on all issues. Absent timely election, each party opposing such relief shall be deemed to have accepted the additur or remittitur. If additur or remittitur is accepted, the trial court shall promptly amend the judgment to conform to the additur or remittitur.

(c) A party that requested additur or remittitur in the trial court and received less than the full relief requested may renew the request in the appellate court. If the appellate court grants additional relief, in whole or in part, it shall afford each party opposing such relief the option to file in the circuit court an election of a new trial. The election shall be filed within 30 days of the date of the mandate.

The decision granting additional relief shall specify whether the new trial will be on damages or on all issues.

Absent timely election, each party opposing such relief shall be deemed to have accepted the additur or remittitur. If additur or remittitur is accepted, the trial court shall promptly amend the judgment to conform to the additur or remittitur.

(d) Consent to any additur or remittitur that the trial court awards in lieu of a new trial does not preclude the consenting party from arguing on appeal that the amount of the verdict was proper or that the amount of the additur or remittitur is excessive. A party consenting to additur or remittitur may not initiate the appeal on that ground but may raise the issue on the other party's appeal.

(e) Neither the trial court nor the appellate court may award additur or remittitur more than once on the ground that the damages are against the weight of the evidence.

ence to the evidence in the particular case.[20]

The true function of the jury is to determine the facts in a given case and reach a fair and just verdict including damages. It is a function that the people of this state in their constitution have retained for 12 of their number to perform without interference. Remittitur is a valid exercise of the judicial function, incident to the judge's power to grant a new trial when a verdict is not supported by the evidence. It is done on an individual basis; a statutory limit on damages grants remittitur on a wholesale basis without regard to the evidence and without the option of a new jury trial. This legislated interference impairs the right of trial by jury "as heretofore enjoyed." As such, the right to trial by jury does not "remain inviolate." It is, in fact, violated.

### Separation of powers?

Closely related to the question of the legislative usurpation of the jury's function is the contention that section 538.210 invades the province of the courts and, therefore, also violates the constitutional doctrine of separation of powers.[21] The

---

**20.** Particularly noteworthy is the decision yesterday of the Supreme Court of Georgia in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 691 S.E.2d 218 (2010), which held that a legislated cap on noneconomic damages—enacted as part of that state's "Tort Reform Act of 2005"—violates the Georgia constitution's guarantee that "[t]he right to trial by jury shall remain inviolate," the same wording as the Missouri constitutional right to trial by jury. Because the constitutional wording is the same as Missouri's, the Georgia court uses the same historical analysis as would be appropriate here.

Other cases on the right to jury trial are collected in Annotation, *Validity, Construction, and Application of State Statutory Provisions Limiting Amount of Recovery in Medical Malpractice Claims*, 26 A.L.R.5th 245 (1995) and Cumulative Supplement. At least four other states have held that damage caps violate the state constitutional right to a trial by jury. *Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156, 164 (Ala.1991) (statute setting $400,000 damage cap on noneconomic damages in medical malpractice cases violated the Alabama Constitution's guarantee of a right to a trial by jury because "the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes *less* than an advisory status," which violates the mandate of a trial by jury (emphasis in original)); *Kansas Malpractice Victims Coal. v. Bell*, 243 Kan. 333, 757 P.2d 251, 255 (1988) (a $250,000 damage cap for recovery of noneconomic damages and requirement that award of future benefits must be used to purchase an annuity contract violates the Kansas

constitutional right to a trial by jury); *Lakin v. Senco Prods. Inc.*, 329 Or. 62, 987 P.2d 463, 474 (1999) (a $500,000 statutory damage cap interferes with jury's fact-finding function, and "[l]imiting the effect of a jury's noneconomic damages verdict eviscerates 'Trial by Jury' as it was understood in 1857 and, therefore, does not allow the common-law right of jury trial to remain 'inviolate' "); *Sofie v. Fibreboard Corp.*, 112 Wash.2d 636, 771 P.2d 711, 719 (1989) (damage cap violated the constitutional right to a trial by jury in Washington, stating: "[T]he Legislature has power to shape litigation. Such power, however, has limits: it must not encroach upon constitutional protections. In this case, by denying litigants an essential function of the jury, the Legislature has exceeded those limits." *Id.* at 719. Interestingly, the trial judge stated that although he found the jury's damage award reasonable, he was required to reduce the award based on the damage cap. *Id.* at 713.). It is also important to note that, as the Washington court pointed out in *Sofie*, the language of the right to trial by jury provisions in states that have found the damage limit unconstitutional are nearly identical to Missouri's provision that the right of a trial by jury shall remain inviolate. *Id.* at 723. *See also* Carly N. Kelly & Michelle M. Mello, *Are Medical Malpractice Damage Caps Constitutional? An Overview of State Litigation*, 33 J.L. MED. & ETHICS 515 (2005).

**21.** Article II, section I of the Missouri Constitution provides:

The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which

question here is whether, by mandating noneconomic damage caps, the legislature is exercising powers rightfully belonging to the judiciary.

The Supreme Court of Illinois in two cases, *Best v. Taylor Mach. Works, Inc.*, 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1078–81 (1997), and *Lebron, a Minor v. Gottlieb Memorial Hospital*, 237 Ill.2d 217, 341 Ill.Dec. 381, 930 N.E.2d 895, 2010 WL 375190 (Ill.2010), has held that limitations on noneconomic damages violate the constitutional separation of powers.[22] Such limitations on jury findings usurp the judicial power to reduce jury awards through remittitur and, therefore, function as an unconstitutional "legislative remittitur."[23]

The power that section 538.210 displaces is not so much the judicial function of remittitur. Rather, what section 538.210 displaces is the right that the people of Missouri have reserved to themselves, as jurors, to perform a vital role in the adjudication process. The right of trial by jury is a source of legitimacy for judicial judgments.

The interests of the judiciary in reserving to itself alone the power of remittitur seems relatively unimportant when compared to the people's right to have their cases judged by jurors and to serve as jurors—as that right is preserved "inviolate" by article I, section 22(a) of the Missouri Constitution.

shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this constitution expressly directed or permitted.

22. This Court declined to address the issue in *Adams* because it was not preserved at trial. 832 S.W.2d at 908, n. 6.

## Conclusion

In the Federalist Papers, No. 83, Alexander Hamilton said that the framers of the United States Constitution "if they agree in nothing else, concur at least in the value they set upon the trial by jury." If there were any differences among them, some would regard the right as "a valuable safeguard to liberty," while others would consider it "as the very palladium of free government."[24] The historical reticence of the courts to overturn verdicts except in the rare circumstances when a verdict does not comport with the evidence shows a deference to the 12 men and women who constitute this basic unit of democracy. That legislation even would be enacted to interfere with the jury's decision was unheard of when the voters of Missouri adopted our state's constitution.

When the people adopted the state constitution, they provided that the right to trial by jury "shall remain inviolate." That is a remarkably clear statement of the importance of the right. If the jury's role is to be abrogated or impaired, then the people ought to approve it by amending their constitution.

That said, I concur in the *per curiam* opinion.

RICHARD B. TEITELMAN, Judge, concurring in result.

I concur in the result of the principal opinion and with the rationale of Judge

23. In Missouri jurisprudence, the term "legislative remittitur" has no real meaning—the legislated limits are not a remittitur at all because remittitur preserves the option to the plaintiff of having a new trial; the power of remittitur is premised on the longstanding necessity of the courts to grant new trials in cases in which the jury's verdict is not supported by the evidence.

24. The Federalist No. 83, at 456 (Scott ed. 1894) (Hamilton).

Wolff's concurring opinion. I write separately to emphasize that the caps on non-economic damages imposed by section 538.210 also violate the constitutional guarantee of equal protection under article I, section 2 of the Missouri Constitution.

Article I, section 2 of the Missouri Constitution guarantees equal protection of the law. *Doe v. Phillips*, 194 S.W.3d 833, 845 (Mo. banc 2006). The equal protection clause ensures that the state cannot treat similarly situated persons differently without adequate justification. "What constitutes adequate justification for treating groups differently depends on the nature of the distinction made." *Id.* Economic and social legislation that is race and gender neutral and that does not infringe on a fundamental right is generally subject only to rational basis review. This deferential standard of review reflects the legislature's wide latitude in crafting the statutes that regulate civic life. When, however, a statute infringes on a fundamental right, this Court must apply strict scrutiny to determine whether the statute is necessary to accomplish a compelling state interest. *Id.*

As Judge Wolff's opinion demonstrates, the right to a trial by jury is a fundamental constitutional guarantee in the Missouri Constitution's bill of rights. The constitutional infirmity of the damage caps at issue in this case perhaps is illustrated more fully by analyzing the issue through the lens of equal protection. It is only then that the real implications of the caps are brought into focus.

The arbitrary caps imposed by section 538.210 will permit some measure of full compensation to those whose injuries are primarily economic. However, simple logic dictates that for those whose injuries are predominantly non-economic, the caps arbitrarily will cut off most of their proven, demonstrated damages. The caps operate on a perverse irony—those with relatively minor injuries are permitted full recovery, while the most severely injured among us are denied. It is difficult to conceive of the necessity of a health care policy that expressly relies on discrimination against the small number of unfortunate individuals who suffer the most debilitating, painful, lifelong disabilities as a result of medical negligence.

There are two more subtle but no less pernicious side effects to caps in this case. In addition to disadvantaging the most seriously injured, the impacts of the caps will fall disproportionately on the young and economically disadvantaged. Young people, because they will have to live with their injuries and disabilities the longest, bear the brunt of section 538.210. Similarly, those with generally more limited economic prospects—the poverty-stricken, the physically and mentally disabled, single mothers, wounded veterans, the elderly, and others—are impacted disproportionately by the arbitrary limits on non-economic damages.

The practical corollary to the denial of full compensation to the young and economically disadvantaged is that, in a case of any complexity, their claims effectively will be extinguished. It takes money to prove medical negligence. Few lawyers will take a complex case of medical negligence on behalf of a poor person whose damages are disproportionately non-economic.

For the young and economically disadvantaged, section 538.210 will act not so much as a cap on damages as it will a padlock on the courthouse door. As compelling as the state's interest in quality health care is, I cannot see the necessity of providing that care on the backs of the

most disadvantaged victims of medical negligence.