IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 ROY DALBEY, )
 Appellant, )
 )
 v. ) WD83602
 )
 HEARTLAND REGIONAL ) FILED: April 6, 2021
 MEDICAL CENTER and ASHOK )
 GOKHALE, M.D., )
 Respondents. )
 Appeal from the Circuit Court of Buchanan County
 The Honorable Daniel F. Kellogg, Judge
 Before Division One: Alok Ahuja, P.J., and
 Thomas H. Newton and Thomas N. Chapman, JJ.
 Roy Dalbey sued Dr. Ashok Gokhale and Heartland Regional Medical Center

in the Circuit Court of Buchanan County. Dalbey claimed that he suffered personal

injuries as a result of medical negligence by Dr. Gokhale, and that Heartland was

vicariously liable for Dr. Gokhale’s actions. Following a nine-day trial, a jury

returned a verdict in favor of Dr. Gokhale and Heartland. Dalbey appeals. We

affirm.

 Background1
 In the early morning on November 6, 2011, Roy Dalbey arrived at

Heartland’s Emergency Department in St. Joseph, accompanied by his roommate,

David Rosenbaum, and a neighbor, Kathy Hoffman. Rosenbaum had found Dalbey

 1 On appeal “[w]e view the facts in the light most favorable to the jury’s
verdict.” Snellen ex rel. Snellen v. Capital Region Med. Ctr., 422 S.W.3d 343, 346 n.1 (Mo.
App. W.D. 2013) (citations omitted).
unconscious and unresponsive in the bathroom of their apartment. Dalbey regained

some level of consciousness five to twenty minutes after Rosenbaum found him.

Hoffman and Rosenbaum drove Dalbey to the hospital.

 A critical question – and perhaps the critical question – in this case is what

Heartland staff were told about Dalbey’s condition during his November 6, 2011

hospital visit. Dalbey’s medical records indicate that he told the emergency room

triage nurse that he had passed out after vomiting up blood approximately half-an-

hour earlier (around 2:30 a.m.). Dalbey stated that he had drank some alcohol

earlier that night. One of his friends told the nurse that when they found him,

Dalbey had “fixed pupils” and had been briefly unresponsive. The triage nurse did

not note any abnormalities based on her initial physical examination. The medical

records indicate that Dalbey was alert and oriented with no signs of acute distress.

Dalbey reported to the nurse that he was not in any pain, and in fact reported a

pain level of zero out of ten.

 Dr. Gokhale was working in Heartland’s Emergency Department when

Dalbey arrived. Dr. Gokhale examined Dalbey. According to Dr. Gokhale’s notes,

Dalbey complained of nausea and a decreased appetite, and stated that he had

vomited blood. Dr. Gokhale found Dalbey to be neurologically normal – he was
alert, fully oriented, and lucid, was able to carry on a normal conversation, and did

not slur his speech. Dr. Gokhale concluded that Dalbey had “almost certainly”

fainted as the result of a vasovagal episode, triggered when he saw his own blood

after vomiting. Dr. Gokhale ordered numerous tests related to gastrointestinal

bleeds, as well as an electrocardiogram (or “EKG”) that would look for potential

cardiac issues. Dr. Gokhale diagnosed Dalbey with gastritis versus peptic ulcer

disease. He prescribed Prilosec, a medication used to decrease gastric acid

secretion. Dalbey was discharged with literature relating to gastrointestinal bleeds,
and with the recommendation that he obtain a follow-up endoscopy.

 2
 When he was discharged, the medical record indicates that Dalbey was

ambulatory and was discharged walking (rather than assisted in a wheelchair) to a

private vehicle, accompanied by his friends.

 Although we view the evidence in the light most favorable to the jury’s

verdict in favor of Dr. Gokhale and Heartland, we note that Dalbey’s companions,

Rosenbaum and Hoffman, provided radically different testimony concerning how

Dalbey presented at the hospital, and what they and Dalbey told Heartland

personnel on the morning of November 6, 2011. While we presume under our

standard of review that the jury disbelieved this testimony, it provides important

background to the issues Dalbey raises on appeal.

 According to Rosenbaum and Hoffman, Dalbey needed their physical

assistance both to enter and to leave the Heartland Emergency Department. They

testified that Dalbey could not remember what had happened earlier that night, his

speech was slurred, and he had difficulty communicating with Heartland staff.

Rosenbaum and Hoffman claimed that they told the triage nurse that Dalbey had

lost bowel and bladder control during his syncopal episode. They testified that they

told both the triage nurse and Dr. Gokhale that Dalbey had complained of severe

headaches, and that Dalbey stated that his headache was so severe that he “felt like
his head was going to blow off,” and that it was a ten out of ten on a pain scale.

Hoffman testified that she told a nurse that Dalbey needed to have his head X-

rayed. In addition, Hoffman and Rosenbaum claimed that they, and Dalbey, all

asked Dr. Gokhale to order an X-ray or computerized tomography (or “CT”) of

Dalbey’s head. They testified that their requests were “blown off,” and that Dr.

Gokhale concluded that an X-ray or CT scan was unnecessary. None of the

circumstances and events which Rosenbaum and Hoffman described were

documented in Dalbey’s medical records, or corroborated by the testimony of
Heartland personnel.

 3
 In the early morning hours of December 2, 2011, less than one month later,

Dalbey again arrived at Heartland’s Emergency Department, this time by

ambulance. Rosenbaum testified that he had noticed Dalbey acting strangely in the

bathroom of their apartment, scrubbing the sink with no running water, and that

Dalbey had said he had a “tremendous horrible headache.” Rosenbaum called 9-1-1

when he observed that Dalbey could not move his left side.

 Dalbey presented at Heartland’s Emergency Department with an “altered

mental status,” was confused and had decreased responsiveness. Emergency

medical personnel reported to Heartland staff that Dalbey’s family had found him

on the floor in the bathroom confused and disoriented about one hour prior to

arriving at the hospital, and that when emergency personnel arrived at his home,

Dalbey was unresponsive. While the Emergency Department nurse was conducting

her initial examination, Dalbey began experiencing an active seizure.

 Dr. Gokhale was again on duty in the emergency room. He ordered a non-

contrast CT scan. The CT scan indicated an intracerebral hemorrhage with acute

subarachnoid hemorrhage as well as intraventricular hemorrhage, possibly from a

ruptured intracranial aneurysm. At approximately 3:13 a.m., Dr. Gokhale

consulted with the on-call neurosurgeon at Heartland. The neurosurgeon
recommended that Dalbey be transferred to another hospital because Heartland

could not treat the massive brain hemorrhage which the CT scan indicated Dalbey

had suffered. At approximately 3:33 a.m., Dr. Gokhale contacted the on-call

neurosurgeon at the University of Kansas Medical Center, and established plans to

transfer Dalbey there for further treatment. Dalbey was life-flighted to the

University of Kansas Medical Center at approximately 3:45 a.m.

 Dalbey’s medical treatment revealed that he had an aneurysm in his right

pericollosal artery, which had ruptured on the night of December 1-2, 2011. Dalbey
suffered intraparenchymal hemorrhage (bleeding in the brain), as well as

 4
subarachnoid bleeding (blood leaking into the fluid surrounding the brain). As a

result, Dalbey suffered substantial and permanent brain damage leading to lasting

disability, and requires substantial on-going care and treatment.

 Dalbey originally filed suit against Heartland and Dr. Gokhale in the circuit

court on November 5, 2013. That case was voluntarily dismissed in April 2015, and

Dalbey then filed the present lawsuit on August 19, 2015. Dr. Gokhale passed away

in 2016, and his widow Rhonda Gokhale was substituted as defendant ad litem. Dr.

Gokhale’s testimony was presented to the jury in the form of his videotaped

deposition, which was taken in October 2015.

 A nine-day jury trial began on September 30, 2019. Although Dalbey had

alleged in his pleadings that Dr. Gokhale was negligent in multiple respects, he

submitted only a single claim to the jury: that Dr. Gokhale was negligent for failing

to order a CT scan of Dalbey’s head when Dalbey first visited Heartland’s

emergency room on November 6, 2011. Dalbey contended that, if a CT scan had

been ordered at that time, it would have revealed his brain aneurysm, and/or a

small “sentinel bleed” from the aneurysm which was a harbinger of its later

rupture. Dalbey claimed that the findings of a CT scan would have led to further

medical treatment before the aneurysm ruptured, and would have prevented him
from suffering massive hemorrhaging and brain damage on December 1-2, 2011.

Dalbey submitted a claim of liability against Heartland based solely on its vicarious

liability for Dr. Gokhale’s negligence.

 The defense presented expert testimony indicating that the aneurysm

rupture on December 2 was an acute event, which was not preceded by a sentinel

leak or bleed. Defense expert Dr. Franz Wippold emphasized that the most common

presentation for aneurysm or sentinel leak is an intense or “thunderclap” headache,

which was not documented in the records of Dalbey’s November 6, 2011 hospital
visit. Dr. Fernando Goldenberg, a neurocritical care specialist, testified for the

 5
defense that Dalbey’s presentation on November 6 (with a history of syncope and

vomiting blood, a normal neurological examination, and no report of pain) was not

consistent with a subarachnoid hemorrhage.

 The jury returned a verdict in favor of Dr. Gokhale and Heartland. The

circuit court entered judgment for defendants on October 23, 2019, and overruled

Dalbey’s motion for a new trial on February 18, 2020.

 Dalbey appeals.

 Discussion
 Dalbey raises four Points on appeal. In Points I and II, he argues that the

circuit court erred in quashing a trial subpoena duces tecum which he had served on

Heartland, and by “preemptively denying” Dalbey’s effort to serve a trial subpoena

on Heartland’s Risk Manager and corporate representative. In Point III, Dalbey

argues that the trial court erred in excluding testimony by Dalbey’s mother and

brother regarding conversations they had with Dr. Gokhale and two other persons

at Heartland on December 2, 2011, during which all three spontaneously denied

that there was any connection between Dalbey’s symptoms on November 6 and the

rupture of his brain aneurysm. In Point IV, Dalbey argues that the circuit court

erred when it prohibited Dalbey from cross-examining Dr. Goldenberg, a defense

expert, to elicit standard-of-care opinions.

 I.
 In his first Point, Dalbey argues that the circuit court erred in quashing a

subpoena duces tecum directed to Heartland.

 Dalbey requested a subpoena duces tecum for trial testimony by Heartland on

September 25, 2019, five days before trial was scheduled to begin. The subpoena

sought to obtain a corporate representative’s testimony on twenty-five separate

topics, and production of documents and tangible items related to eleven of those
topics. The subpoena duces tecum was served on Heartland on September 26, 2019.

 6
On September 27, Heartland filed a motion to quash the subpoena duces tecum,

which was taken up at a pre-trial conference held on the morning of September 30,

before trial began. At the pre-trial conference, Dalbey abandoned many of the

topics designated in the original subpoena. The remaining topics were related to

“certain nurse protocols in effect in November 2011 concerning Roy’s symptoms”

and Heartland’s “control and right of control over Gokhale.” The remaining

document requests concerned “the nurse protocols and documents reflecting

whether Gokhale was required to comply with [Heartland]’s medical staff by-laws,

rules and regulations in November 2011.” The circuit court sustained Heartland’s

motion to quash the subpoena.

 We need not decide whether the circuit court abused its discretion in

quashing the Heartland subpoena, because Dalbey could not establish that he was

prejudiced by the circuit court’s ruling, even if it was incorrect. The two issues

ultimately submitted to the jury in this case were (1) whether Dr. Gokhale was

negligent in failing to order a CT scan of Dalbey’s head on November 6; and

(2) whether Heartland was vicariously liable for Dr. Gokhale’s negligence under the

doctrine of respondeat superior.

 The request for testimony and documents concerning nursing protocols
appears to be related to a claim Dalbey had previously asserted against Heartland,

alleging that it was liable based on the negligent conduct of its nurse-employees.

Dalbey abandoned that claim at trial, and the quashing of a subpoena related to

that abandoned issue cannot justify reversal.

 The other requests for testimony and documents concern Heartland’s right to

control Dr. Gokhale, and relate solely to Heartland’s vicarious liability for Dr.

Gokhale’s negligence. The jury found in favor of Dr. Gokhale on Dalbey’s claim of

medical negligence, however, and the issue of Heartland’s vicarious liability thereby
became moot. “It is established in this state that where the right to recover is

 7
dependent entirely on the doctrine of respondeat superior and there is a finding of

no negligence by the servant there should be no judgment against the master.”

Moran v. N. Cnty. Neurosurgery, Inc., 714 S.W.2d 231, 232-33 (Mo. App. E.D. 1986)

(citation omitted); accord Stanton v. Hart, 356 S.W.3d 330, 338 (Mo. App. W.D.

2011) (“’If an employee is exonerated from liability because the employee has not

committed a tort,’ the employer is also exonerated.” (citation omitted)); Howard v.

Youngman, 81 S.W.3d 101, 117 (Mo. App. E.D. 2002); Arnold v. Erkmann, 934

S.W.2d 621, 631 (Mo. App. E.D. 1996).

 Because the jury found that Dr. Gokhale was not negligent, it was

unnecessary for the jury to separately consider whether Heartland could be

vicariously liable for his actions. Because it was unnecessary for the jury to decide

whether Heartland was vicariously liable for Dr. Gokhale’s negligence, the quashing

of a subpoena seeking information related only to the vicarious liability issue could

not have prejudiced Dalbey. An appellant cannot establish prejudicial error

justifying reversal, where the claimed error relates to an issue the jury was not

required to resolve. See, e.g., Ziolkowski v. Heartland Reg’l Med. Ctr., 317 S.W.3d

212, 219-20 (Mo. App. W.D. 2010) (no prejudice from exclusion of evidence relevant

to punitive damages, where jury found no underlying liability; “When the jury's
verdict demonstrates that it never reached the issue which is claimed to be the

source of prejudice then no prejudice has been demonstrated.” (citation omitted));

Koenke v. Eldenburg, 803 S.W.2d 68, 71 (Mo. App. W.D. 1990) (“[s]ince the jury

found against plaintiff on the issue of liability,” any error by trial court in excluding

evidence relevant only to damages could not have prejudiced the plaintiff); Mahan

v. Mo. Pac. R.R. Co., 760 S.W.2d 510, 515-16 (Mo. App. E.D. 1988) (same).

 Point I is denied.

 8
 II.
 In his second Point, Dalbey argues that the circuit court erred “in

preemptively denying plaintiff the opportunity to subpoena [Heartland]’s Risk

Manager and Corporate Representative.”

 On September 30, 2019, the first day of trial, Dalbey obtained – but did not

serve – a subpoena directed to Sara Juarez, Heartland’s Risk Manager and

corporate representative at trial. Dalbey contends that he “delayed service [of the

Juarez subpoena] while awaiting the court’s ruling” on Heartland’s motion to quash

the subpoena duces tecum directed to Heartland itself, because of the “overlapping”

arguments Heartland made in opposition to both subpoenas. The record reflects

that at a pre-trial hearing on Heartland’s motions to quash, Dalbey’s counsel

declined to serve the Juarez subpoena, even though she was present at the court.

Moreover, the record indicates that the circuit court never actually ruled on

Heartland’s motion to quash the Juarez subpoena.

 Our review of Heartland’s motions to quash the Heartland subpoena, and to

quash the Juarez subpoena, indicates that the motions raised different arguments.

Both motions complained that Dalbey’s subpoenas were served too close to the

commencement of trial. But that is the extent of the similarity. The motion to
quash the Heartland subpoena argued that Missouri’s rules of civil procedure do not

authorize a trial subpoena for testimony of a corporate representative on designated

topics, and that it would be unduly burdensome for Heartland to designate a

corporate representative to testify to all of the topics identified in the Heartland

subpoena on such short notice. On the other hand, the motion to quash the Juarez

subpoena contended that, because she is an attorney, any relevant information

Juarez possessed concerning the case would be protected by the attorney-client

privilege, and that she was a top-level corporate executive whose compelled
testimony was unnecessary and unwarranted. The circuit court’s quashing of the

 9
Heartland subpoena did not necessarily indicate that the court would have also

quashed the Juarez subpoena. It would not have been futile for Dalbey to serve the

Juarez subpoena, and obtain a ruling from the court on the propriety of that

subpoena.

 It is well settled that “there can be no review of a matter which has not been

presented to or expressly decided by the trial court.” BMJ Partners v. King’s Beauty

Distrib. Co., 508 S.W.3d 175, 179 (Mo. App. E.D. 2016) (citation and internal

quotation marks omitted). Dalbey cites no caselaw that would entitle him to

challenge the “preemptive” quashing of the Juarez subpoena when the subpoena

was never actually served, and the circuit court never actually ruled on the

subpoena’s propriety. Dalbey’s reliance on Grimes v. Bagwell, 809 S.W.2d 441 (Mo.

App. S.D. 1991), for the proposition that “the law does not require the doing of a

useless thing,” is misplaced. Grimes held only that a defendant need not further

object to the holding of a bench trial after an earlier, timely demand for a jury trial

had been denied by the circuit court. Id. at 444. In this case, by contrast, the

circuit court never ruled on the issue Dalbey raises on appeal.

 Point II is denied.

 III.
 In his third Point, Dalbey argues that the circuit court erred in excluding

testimony of two members of Dalbey’s family concerning conversations they claimed

to have had with Dr. Gokhale and two other unidentified persons at Heartland on

December 2, while Dalbey was receiving treatment after the aneurysm ruptured.

 Prior to trial, Heartland moved in limine to exclude evidence relating to

conversations Dalbey’s mother, Virgie Dalbey, claimed to have had with three

people associated with Heartland on December 2, 2011, in which she contended that

the Heartland representatives spontaneously denied any relationship between

 10
Dalbey’s November 6, 2011 emergency room visit, and his visit on December 2. The

circuit court sustained the motion in limine.

 At trial, Dalbey moved to reconsider the court’s limine ruling. In support of

the motion to reconsider, Dalbey made an offer of proof through the testimony of

Virgie Dalbey, and Dalbey’s brother Kelly Dalbey.

 Virgie Dalbey testified that while she was in the Emergency Department

waiting room at Heartland in the early morning hours of December 2, 2011, “a man

in scrubs came out and said that [Dalbey had suffered] a bad brain bleed,” and that

Dalbey would be life-flighted to the University of Kansas Medical Center for further

treatment. She testified that the man told her the brain bleed “was in no way

related for what [Dalbey] had been seen for prior,” referring to his November 6,

2011 visit to the emergency room. Virgie Dalbey testified that, after the man in

scrubs went back into the emergency room, “[a]nother guy came out in scrubs,” and

told her, “[t]his is in no way related to what [Dalbey] had been seen for prior.”

Finally, she testified that after the second unidentified man left, a third man

dressed in a “suit, hankie and tie that matched and shiny shoes,” came out and told

her “exactly the same thing” as the prior two persons: that Dalbey’s condition on

December 2, 2011, “wasn’t related to what [Dalbey] had been seen for prior.” Virgie
Dalbey testified that she did not know the identities of any of the three persons who

spoke to her.

 Kelly Dalbey testified in his offer of proof that while he was at Heartland on

December 2, 2011, “Doctor Guglio” (whom Kelly identified with a picture of Dr.

Gokhale) “come out and told us that Roy was in critical condition. He was going to

get life flighted to KU. Then he proceeded to tell us that this incident had nothing

to do with the prior incident.” Kelly Dalbey testified that “I told him that I didn't

see how it didn't [have a relationship to the earlier emergency room visit]. It had to
have because he came in here with headaches. And you told him that he had a

 11
stomach ulcer, pretty much.” Kelly Dalbey testified that Dr. Gokhale did not

respond further. Kelly Dalbey testified that later a “guy in a suit” came out and

“basically said the same thing” – “[t]hat the two incidents were not related.” Kelly

Dalbey testified that he argued with this second individual also.

 The trial court overruled Dalbey’s motion to reconsider its ruling sustaining

Heartland’s motion in limine, and excluded the testimony.

 “A trial court enjoys considerable discretion in the admission or exclusion of

evidence, and, absent clear abuse of discretion, its action will not be grounds for

reversal.” Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 114 (Mo.

2015) (citation and internal quotation marks omitted). “A ruling constitutes an

abuse of discretion when it is ‘clearly against the logic of the circumstances then

before the court and is so unreasonable and arbitrary that it shocks the sense of

justice and indicates a lack of careful, deliberate consideration.’” Id. (citation

omitted).

 To be admissible, evidence must be both logically relevant and legally
 relevant. Evidence is logically relevant if it makes the existence of any
 fact that is of consequence to the determination of the action more
 probable or less probable than it would be without the evidence. Legal
 relevance . . . refers to the balance between the probative value and the
 prejudicial effect of the evidence. That balancing requires the trial
 court to weigh the probative value, or usefulness, of the evidence
 against its costs, specifically the dangers of unfair prejudice, confusion
 of the issues, undue delay, misleading the jury, waste of time, or
 needless presentation of cumulative evidence. If the prejudicial effect
 of the evidence outweighs its probative value, then the evidence is not
 relevant and should be excluded.
Brummett v. Burberry Ltd., 597 S.W.3d 295, 303-04 (Mo. App. W.D. 2019) (citing

Kerr v. Mo. Veterans Comm’n, 537 S.W.3d 865, 876 (Mo. App. W.D. 2017); internal

quotation marks omitted). “For evidentiary error to cause reversal, prejudice must

be demonstrated[, that is] there is a reasonable probability that the trial court’s

 12
error affected the outcome of the trial.” S.F.M.D. v. F.D., 477 S.W.3d 626, 636 (Mo.

App. W.D. 2015) (citations and internal quotation marks omitted).

 Dalbey argued in the circuit court, and argues on appeal, that the statements

to which Virgie and Kelly Dalbey testified were admissible because they constituted

admissions of a party opponent. As the Missouri Supreme Court has only recently

explained, however,

 [a]n admission of a party opponent is a statement by a party that
 consciously or voluntarily acknowledges the existence of certain facts
 unfavorable to, or inconsistent with, the position taken by the party at
 trial and relevant and favorable to the cause of the opposing party who
 offers the statement.
Sherrer v. Boston Scientific Corp., 609 S.W.3d 697, 710 (Mo. 2020) (citing Thomas v.

Harley-Davidson Motor Co. Grp., LLC, 571 S.W.3d 126, 138-39 (Mo. App. W.D.

2019)); see also, e.g., Hemphill v. Pollina, 400 S.W.3d 409, 414 (Mo. App. W.D.

2013). There is nothing about the statements Virgie and Kelly Dalbey attributed to

the three Heartland representatives which was “unfavorable to, or inconsistent

with,” the position taken by Dr. Gokhale or Heartland at trial. To the contrary,

Virgie and Kelly Dalbey contended that, on December 2, 2011, Dr. Gokhale and two

other unknown Heartland representatives took exactly the same position which the

defendants took almost eight years later at trial: that the massive intracranial
hemorrhage which Dalbey experienced on December 2, 2011, was unrelated to the

circumstances which had brought him to the emergency room on November 6. The

Supreme Court has observed that the “requirement that the admission be

inconsistent with what the declarant is claiming at trial” is “a type of relevancy

requirement, which recognizes that it would be a waste of time to offer a statement

to prove something that a party has already conceded at trial.” Egelhoff v. Holt, 875

S.W.2d 543, 551 n.4 (Mo. 1994). Given that the purported “admissions” made by Dr.
Gokhale and other Heartland representatives were fully consistent with the

 13
defendants’ position at trial, the circuit court did not err in excluding the

statements to which Virgie and Kelly Dalbey offered to testify.

 Separate from the fact that these statements did not constitute “admissions,”

the circuit court did not abuse its discretion in concluding that the statements were

not relevant. Dalbey first argues that the December 2, 2011 statements would

contradict Dr. Gokhale’s testimony in two respects: (1) the statements would

contradict his denial (in his deposition taken on October 10, 2015) of any

recollection of treating Dalbey in November-December 2011; and (2) the statements

would contradict Dr. Gokhale’s claim that he was not aware of anyone conducting

any investigation of his treatment of Dalbey on November 6, 2011.

 As the Missouri Supreme Court has explained: “Evidence contradicting a

witness’s testimony not only supplies direct factual evidence but also may be used to

undermine the confidence in the reliability of the witness’s testimony.” State v.

Taylor, 466 S.W.3d 521, 530 (Mo. 2015) (citation omitted). Contradiction evidence is

“evidence that the witness ‘made a factual error’ in his or her testimony,” which

serves to “undermine the confidence in the reliability of the witness’s testimony.”

Sherrer, 609 S.W.3d at 707 (citations and internal quotation marks omitted); see

also Menschik v. Heartland Reg’l Med. Ctr., 531 S.W.3d 551, 561 & n.7 (Mo. App.
W.D. 2017) (citations omitted).

 The circuit court did not abuse its discretion in concluding that the proffered

testimony from Virgie and Kelly Dalbey would not contradict Dr. Gokhale’s

testimony. First, this testimony does not contradict Dr. Gokhale’s testimony that,

at the time of his deposition in October 2015, he did not have “[a]ny independent

recollection of any conversation [he] may have had with anybody about the case . . .

that night at the hospital.” It is not clear from Dr. Gokhale’s testimony whether

“that night” to which he was referring was December 2 rather than November 6.
But even if he was referring to December 2, Dr. Gokhale did not testify that he did

 14
not speak with anyone that night. He testified only that he had no “independent

recollection” of doing so. The testimony of Virgie and Kelly Dalbey that such a

conversation occurred does not contradict Dr. Gokhale’s testimony that he did not

independently recall that conversation almost four years later. We also note that,

in his deposition testimony, Dr. Gokhale stated that Heartland’s medical records

accurately recorded his actions on the two nights in question. Those medical

records specifically stated that Dr. Gokhale had discussed Dalbey’s condition,

prognosis, and future course of treatment with members of Dalbey’s family on

December 2, before Dalbey was transferred to the University of Kansas Medical

Center. Dr. Gokhale did not deny that he had a conversation with members of

Dalbey’s family on the night of December 2, 2011.

 Nor does this proffered testimony contradict Dr. Gokhale’s testimony that,

“[a]s far as [he] know[s], no investigation was done” into Dalbey’s case. Even if the

three persons who purportedly spoke with Virgie and Kelly Dalbey on December 2,

2011, had coordinated their remarks, this does nothing to indicate that an

“investigation” of Dalbey’s treatment had been conducted.

 Dalbey also argues that the proffered testimony is relevant to show a

“consciousness of guilt” on the defendants’ part, since it purportedly shows “a
conscious, deliberate and deceitful attempt by [Dr.] Gokhale and [Heartland] to

cover up [Dr. Gokhale’s] medical malpractice on November 6.” Dalbey cites no

authority supporting the admission in a civil case of a defendant’s denial of

culpability, fully consistent with the defendant’s position at trial, to establish the

opposite proposition, and we are aware of none. The circuit court did not abuse its

broad discretion by rejecting this theory of relevance.

 Finally, Dalbey argues that the circuit court erred in excluding his proffered

testimony because it “would have helped lay a foundation to establish [Heartland]’s
duty to preserve the video recordings of Roy both inside the ER and outside as he

 15
approached the entrance,” and thus could have supported an argument that the

jury could have drawn an “adverse inference” against Heartland based on its

spoliation of evidence.

 To constitute spoliation, the destructive act must be intentional,
 indicating fraud, deceit, or bad faith. The failure to adequately explain
 the evidence’s destruction may give rise to an adverse inference. . . .
 Simple negligence is not sufficient to satisfy the mental-state element
 of spoliation. Thus, the burden is on the party seeking the application
 and the benefit of the spoliation doctrine to make a prima facie
 showing that the opponent destroyed the missing evidence under
 circumstances manifesting fraud, deceit, or bad faith.
Marmaduke v. CBL & Assocs. Mgmt., Inc., 521 S.W.3d 257, 269 (Mo. App. E.D.

2017) (citations and internal quotation marks omitted).

 The circuit court was entitled to find, in its discretion, that there was at best

a very tenuous connection between the defendants’ denial of a relationship between

Dalbey’s November 6 and December 2 emergency room visits, and a recognition that

they should preserve video recordings of Dalbey entering or exiting the emergency

room on November 6. The record indicates that such video recordings were

routinely erased or overwritten after thirty days. The circuit court could reasonably

conclude that it would not have been reasonably apparent to the defendants that

video recordings of Dalbey’s entry and exit from the emergency room on November
6, 2011, would have any relevance to a claim that Dr. Gokhale should have

recognized on November 6 that Dalbey was experiencing a neurological emergency,

and that he should have ordered a CT scan. The video recordings are not medical

records, and were not created or maintained by medical personnel. It is noteworthy

that even in Kelly Dalbey’s offer of proof testimony, in which he contends that he

argued with Dr. Gokhale about the relationship between the November 6 and

December 2 incidents, Kelly Dalbey merely referenced the fact that Dalbey had

complained of headaches on November 6 – not that Dalbey had difficulty entering or
exiting the hospital. Nothing in the offer of proof testimony would have alerted the

 16
defendants that a video recording of Dalbey entering or leaving the emergency room

on November 6 constituted relevant evidence for a potential malpractice claim.

 Point III is denied.

 IV.
 In Point IV, Dalbey argues that the circuit court erred by limiting his cross-

examination of a defense expert witness, Dr. Fernando Goldenberg. Specifically,

Dalbey argues that the trial court erroneously prohibited him from eliciting

testimony from Dr. Goldenberg whether Dr. Gokhale breached the applicable

standard of care by not ordering a CT scan of Dalbey’s head on November 6, 2011.

 Generally speaking, we review a circuit court’s decision whether to admit or

exclude an expert’s testimony for an abuse of discretion. Klotz v. St. Anthony’s Med.

Ctr., 311 S.W.3d 752, 760 (Mo. 2010). “A trial court will be found to have abused its

discretion when a ruling is clearly against the logic of the circumstances then before

the court and is so arbitrary and unreasonable as to shock the sense of justice and

indicate a lack of careful consideration.” Id. (citation and internal quotation marks

omitted).

 The defense called Dr. Goldenberg, a neurocritical care specialist, to testify as

an expert witness. On direct examination, Dr. Goldenberg testified that in his

medical practice, he treats patients for brain or spinal cord problems or injuries,

including brain aneurysms and subarachnoid hemorrhage. Dr. Goldenberg testified

that he consults “[a]lmost daily” with emergency physicians. Dr. Goldenberg

testified that his role in this case was to “look at the presentation from November

6th and December 2nd and decide whether [he] thought there was any relationship

between those two presentations.”

 On direct examination, Dr. Goldenberg opined that Dalbey’s presentation at

Heartland on November 6 (with a history of having vomited blood with transient
loss of consciousness, but neurologically normal) was not consistent with a

 17
subarachnoid hemorrhage and did not suggest a “neurological emergency.” Dr.

Goldenberg also testified that, based on Dalbey’s presentation and the medical

records, his brain aneurysm ruptured on December 2, 2011, without a preceding

“sentinel bleed.”

 On cross-examination, Dalbey’s counsel sought to elicit testimony from Dr.

Goldenberg as to whether the standard of care required Dr. Gokhale to conduct

further neurological investigations on November 6, 2011. Defense counsel objected,

contending that Dr. Goldenberg was not a “standard of care” expert, that he

practiced a different specialty than Dr. Gokhale, and that Dalbey’s counsel’s

questioning was outside the scope of direct examination. The circuit court observed

that testimony from Dr. Goldenberg would “not [be] relevant if he’s not able to talk

about the standard of care of an emergency room physician, because that’s what

this case is about, standard of care for the emergency room physician in this

situation.” The court permitted Dalbey’s counsel to conduct a voir dire examination

of Dr. Goldenberg, outside the presence of the jury, to seek to lay a foundation for

admission of standard-of-care opinions.

 During his voir dire examination, Dr. Goldenberg maintained that he was

“not here to offer standard of care” testimony. Dr. Goldenberg stated that as a
physician brought into the emergency room to consult on patients exhibiting

neurological symptoms, he was required to conform to the standard of care “of [his]

specialty.” Dalbey’s counsel asked what steps a neurocritical care specialist, an

emergency room physician, and an internist would take if presented with a patient

exhibiting confusion, disorientation, abnormal eye movement, decreased

responsiveness, seizure activity, and shaking. (Dr. Gokhale was board certified in

both internal medicine and emergency medicine.) The following exchange followed:

 A. I do not know what the standard of care for an emergency
 physician is. So I would not answer that because I do not really know.

 18
 Q. I'm asking with regard to any doctor, any of those three
 doctors, are there steps that you must take with these symptoms?
 A. There are basic steps that probably, yes, are common, but
 there are more sophisticated steps that probably are completely
 different depending on your specialty, even when facing the same
 clinical circumstances.
 Q. So you have no idea whether an internal medicine doctor
 would have – what steps they would have to take?
 A. What I said is that depending on the specialty, the
 standard of care is probably different. And if you ask me as a
 neurocritical care doctor, I would say that I know exactly what to do. If
 you ask me as an emergency physician, I do not know.
 Q. What about an internal medicine?
 A. Internal medicine, I don't practice internal medicine as a
 part of my routine life. I practice neurocritical care.
Following the voir dire examination, the circuit court sustained defense counsel’s

objection, ruling that it would not allow Dr. Goldenberg to testify as to standard of

care.

 Although the court did not permit Dalbey to elicit an opinion from Dr.

Goldenberg concerning the standard of care for an emergency physician or internist,

Dalbey’s counsel was able to obtain testimony from Dr. Goldenberg that he would

have ordered a CT scan of Dalbey’s head, if Hoffman’s and Rosenbaum’s testimony

concerning the incident on November 6, 2011, were true:

 Q. . . . Doctor, if he had vomited, passed out, was
 unconscious for a period of time, eyes wide open, eyes rolled back in his
 head, unable to walk by himself and a horrible headache, you as a
 neurocritical care doctor, you would be concerned about a problem, an
 intracranial problem, wouldn't you?
 A. With the things that you just described, yes.
 Q. And if you were concerned, you'd have to investigate it,
 wouldn't you?
 A. Yes.
 Q. A 10 out of 10 headache is a very concerning situation, a
 10 out of a 10 headache?

 19
 A. Yes.
 Q. And with just passing out and a 10 out of 10 headache,
 that is enough there to require a CT scan, isn't it?
 A. Yes.
 Q. No question about it.
 A. Yes, sorry.
Dr. Goldenberg also agreed that he would be “concerned” “if a person’s mentation

doesn’t return to normal rapidly” after a syncopal episode, and would investigate

further. He also agreed that “loss of bladder control is a neurological concern” if it

occurs in connection with syncope. Dr. Goldenberg specifically agreed with the

statement that, “if [Rosenbaum] and [Hoffman] are telling the truth [as to what

they told medical staff on November 6], you would be suspicious, if you were the

doctor, for a subarachnoid hemorrhage.”

 On appeal, Dalbey argues that the circuit court erred in preventing him from

cross-examining Dr. Goldenberg about the standard of care applicable to Dr.

Gokhale, because Dr. Goldenberg was qualified to give standard-of-care opinions.

 Dalbey’s argument ignores, however, that Dr. Goldenberg repeatedly stated

during his voir dire examination that he was not familiar with the standard of care

applicable to emergency physicians or internists, and that he therefore had no
relevant opinion to offer concerning whether Dr. Gokhale had complied with the

relevant standard of care. Under Missouri law, “a physician is required to use and

exercise that degree of care, skill and proficiency which is commonly exercised by

the ordinarily skillful, careful, and prudent physician engaged in a similar practice

under the same and similar conditions.” Piel v. Galbol, 559 S.W.2d 38, 39-40 (Mo.

App. 1977) (emphasis added; citing Fisher v. Wilkinson, 382 S.W.2d 627, 630 (Mo.

1964)); see also, e.g., Gridley v. Johnson, 476 S.W.2d 475, 482-83 (Mo. 1972); Yoos v.

Jewish Hosp. of St. Louis, 645 S.W.2d 177, 183 (Mo. App. E.D. 1982); Swope v.
Razzaq, 428 F.3d 1152, 1155-56 (8th Cir. 2005) (Missouri law). As Dalbey points

 20
out, the Missouri Supreme Court has held that a physician practicing one specialty

may be qualified to offer a standard-of-care opinion concerning the actions of a

physician having different specialty training. Klotz, 311 S.W.3d at 761 (holding

that a physician who “completed an internal medicine residency and did specialty

training in infectious disease and pulmonary disease” was qualified “to testify about

issues related to the cardiology or electrophysiology standard of care”). But the fact

that a physician who specializes in one area of medical practice may be qualified to

testify concerning the standard of care applicable to another area of specialization,

does not mean that the circuit court is required to admit testimony from a physician

who denies knowledge of the standard of care applicable to another practice area.

 In this case, Dr. Goldenberg repeatedly stated that he did not have an

opinion concerning the standard of care applicable to Dr. Gokhale, or concerning

whether Dr. Gokhale had complied with that standard of care, because he was

insufficiently familiar with the standards of practice applicable to emergency

medicine and internal medicine. While Dalbey may believe this testimony lacked

credibility, the circuit court did not abuse its discretion in limiting Dalbey’s cross-

examination given Dr. Goldenberg’s voir dire testimony. The circuit court did not

abuse its discretion when it refused to force Dr. Goldenberg to give opinions on
matters on which he asserted that he had no opinions because of a lack of relevant

knowledge.

 Even if the circuit court erred in limiting Dalbey’s cross-examination of Dr.

Goldenberg, this would not justify reversal. We will reverse for evidentiary error

only if the erroneous evidentiary ruling was prejudicial. Campbell v. Union Pac.

R.R. Co., 616 S.W.3d 451, 474 (Mo. App. W.D. 2020); Revis v. Bassman, 604 S.W.3d

644, 654 (Mo. App. E.D. 2020). To establish prejudice sufficient to justify reversal,

the appellant must show that the erroneous exclusion of evidence “materially
affected the merits of the action.” Will v. Pepose Vision Inst., P.C., 528 S.W.3d 433,

 21
436, 438 (Mo. App. E.D. 2017); see also Secrist v. Treadstone, LLC, 356 S.W.3d 276,

284 (Mo. App. W.D. 2011) (to obtain reversal based on evidentiary error, appellant

must demonstrate that the “trial court’s error affected the outcome of the trial”;

citation and internal quotation marks omitted).

 As we have described above, Dr. Goldenberg specifically and repeatedly

stated during his voir dire examination that he was unable to offer an opinion

concerning the standard of care applicable to an emergency room physician or

internist like Dr. Gokhale. There is nothing in the record to suggest that Dr.

Goldenberg would have testified differently if he had been asked the same questions

in front of the jury. We fail to see how Dalbey was prejudiced by the fact that the

jury did not hear Dr. Goldenberg’s expressions of agnosticism.

 Moreover, despite the limitations the circuit court placed on Dalbey’s cross-

examination, he was permitted to elicit testimony from Dr. Goldenberg that the

symptoms to which Rosenbaum and Hoffman testified would cause him to “be

concerned about . . . an intracranial problem” and to “be suspicious . . . for a

subarachnoid hemorrhage,” and that these concerns and suspicions would require

further neurological investigation. Dr. Goldenberg testified that the loss of bladder

control, and persistent confusion following syncope, were symptoms of concern.
Moreover, he testified that a report of a ten-point headache “is a very concerning

situation” which would be “enough . . . to require a CT scan” when combined with an

episode of syncope. This testimony provided substantial support for Dalbey’s claim

that Dr. Gokhale had violated the standard of care – assuming that the jury

believed the testimony of Rosenbaum and Hoffman (which it evidently did not). In

these circumstances, we cannot find that the limitations the circuit court placed on

Dalbey’s cross-examination of Dr. Goldenberg “materially affected the merits of the

action,” even if those limitations were themselves erroneous.
 Point IV is denied.

 22
 Conclusion
 The judgment of the circuit court is affirmed.

 Alok Ahuja, Judge
All concur.

 23